IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW JERSEY.

JUNE TERM, 1878.

---

## JOHN SCHOMP v. ISRAEL SCHENCK.

1. A contract of an attorney at law for a certain remuneration for his services is legal and can be enforced by suit, such an officer not standing on the same footing as an advocate.
2. The law of maintenance and champerty does not prevail in this state.

---

The plaintiff was an attorney at law, and brought this suit against the defendant for moneys alleged to be due for services rendered as such attorney, under a special contract. It was shown at the trial that the defendant was interested in resisting the probate of the will of the late Dr. Vanderveer, and that he had put in a *caveat* which had been drawn by the plaintiff. The testimony of the plaintiff, in proof of his bargain, was as follows: "He," the defendant, "said he couldn't afford to go to much expense, and asked me what I would charge him; he said that if the will were set aside, and he got a share of the estate, he could afford to pay well; if it was not, he couldn't afford to pay me much; I told him I didn't hardly know what I ought to charge him; that it would

195

be a big case; I said to him that the usual charge for collections would be five per cent., but I didn't know how that would be in this case; he said he would be very willing to pay me that in case I succeeded, and he got his share of the money; but that if he didn't, or if the will was not set aside, that then he couldn't afford to pay much more than my expenses; I told him I was willing to undertake to look after his interest upon those terms, if he would agree to give me that and pay such necessary expenses as I had been to, in case we lost, and run the risk of getting the rest out of any allowance made by the court; he said he was satisfied."

Argued at February Term, 1878, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, SCUDDER and KNAPP.

For the plaintiff, *Jacob Vanatta.*

For the defendant, *Benjamin Williamson.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.     This suit is brought to recover the amount alleged to be due to the plaintiff for certain services rendered, as an attorney at law, to the defendant, and which were to be paid for at a certain rate, according to the terms of a parol contract made between them.    At the time of this engagement of the plaintiff, a proceeding was pending before the surrogate-general, touching the probate of a will, against which the defendant had filed a *caveat,* and, as has been found by the jury, the plaintiff was duly employed by the defendant to attend in his behalf to that litigation, with the understanding that if successful in the suit, he was to be paid in the ratio of five per cent. on the sum recovered, but if thwarted, he was to receive his expenses and such compensation as might be awarded to him out of the estate, according to the practice in the ecclesiastical courts.    The will referred to was rejected, and in the distribution of the estate a considerable sum came to the defendant; so that no question can be

made with respect to the plaintiff's right to recover in this action, if it be settled that his contract providing for his remuneration in a specified manner, be a valid one.

The legality of that contract, therefore, is the essential question in this case, and this, on the argument, was put in dispute on two grounds.

In the first place, it was insisted that the law will not permit an attorney at law to contract with his client for a compensation for his services, and that if such contract be made, it cannot be enforced by an action. The ground of this contention was, that an attorney belongs to a liberal profession, one of whose cardinal rules it is, that it would suffer a disparagement if its members could put out their intelligence and learning to hire, and that, consequently, the rewards for their services must be altogether voluntary gifts, not *merces*, but *honoraria*. To sustain this position, the cases of *Seeley and others* v. *Crane*, 3 *Green* 35, and *Vanatta* v. *McKinney's Executors*, 1 *Harr.* 235, were cited. But it is very plain that neither of these decisions is in point, for neither of them related to services of an attorney at law, but both to the functions of an advocate. In the case now before this court, it is shown that at the time this contract was entered into, the plaintiff was an attorney, but was not a counsellor, and that, therefore, the services bargained for did not pertain to advocacy; and this difference places this case entirely aside of the line of these previous judgments. In the former of these reported cases, all that was adjudged was, that the fees of counsel, *eo nomine*, could not be recovered in an action of *assumpsit*, the reason assigned being, that, following the example of the Roman orators and English barristers and sergeants, such counsel did not demand compensation as a matter of right, but accepted a fee as an honorary gift; the court, however, expressly reserving the question whether such counsel fees, when due by special contract, could not be recovered by suit. And nothing different from this was settled by the latter of the cited cases, it being there declared that the service of counsel in speaking to a cause in court was an excep-

tion to the ordinary rule that a claim for labor, done at the request of another, was legally enforceable.

And this I regard as the established discrimination. I do not find anywhere, that it was the common law rule that, irrespective of the law of maintenance, an attorney at law could not stipulate for his compensation. Such contracts were undoubtedly regarded with great jealousy by the courts, and were very generally discountenanced by the legal profession, and were seldom enforced, and were not unfrequently set aside by courts of equity. But the idea that attorneys were subject to the same disability as an advocate was, in regard to contracting with their clients for their remuneration, has no foundation in legal history or adjudged cases. Unlike those of the English barrister, the services of the attorney were not thought to be purely honorary. He was of right entitled to certain fees, and the conditions of his *status* were not such as to disqualify him to contract for remuneration. The attorney could bind himself to his client, and the client to the attorney, by a contract which was reciprocally enforceable, but no such tie as this could be created between the client and the advocate. In legal theory the connection of the counsel with his client was voluntary, and rested altogether in moral considerations, and no agreement for service on the one side, or for remuneration on the other, could be made by expression or implication, that would form the basis for a suit. On such an agreement neither could sue or be sued. In *Fell* v. *Brown*, *Peake* 96, Lord Kenyon held that an action would not lie against a barrister for misconduct in the management of a cause; and in *Turner* v. *Phillips*, *Peake* 122, that a fee given to such an officer to argue a cause which he did not attend, could not be recovered; and, so again, in *Mulligan* v. *McDonough*, 2 *L. T.* (*N. S.*) 136, it was ruled that an action against a barrister for non-attendance at a trial, was not maintainable. The law was thoroughly settled that the client could not convert what the courts regarded as a moral obligation on the part of the advocate, into a legal one. And, conversely, the same infirmity of obligation was held to exist.

Schomp v. Schenck.

wherever the advocate presented himself as the *dominus litis*, the response to his plaint being that his claim, however fair or equitable, had no legal force. And this immunity and disability of these officers were entirely the creatures of the importance of their functions and the powers and privileges with which they were invested. Chief Justice Erle, in his masterly opinion in *Kennedy* v. *Brown*, 13 *C. B.* (*N. S.*) 677, which is the leading case upon this subject, when expressing the reason why the advocate should theoretically be considered an unhired agent, thus describes the magnitude and importance of his office. He says, speaking of the advocate : " He is trusted with interests, and privileges and powers almost to an unlimited degree. His client must trust to him at times for fortune and character and life. The law trusts him with a privilege in respect of liberty of speech which is in practice bounded only by his own sense of duty ; and he may have to speak upon subjects concerning the deepest interest of social life, and the innermost feelings of the human soul. The law also trusts him with a power of insisting on answers to the most painful questioning, and this power, again, is in practice, only controlled by his own view of the interests of truth. It is of the last importance that the sense of duty should be in active energy proportioned to the magnitude of these interests. If the law is, that the advocate is incapable of contracting for hire to serve when he has undertaken an advocacy, his words and acts ought to be guided by a sense of duty, that is to say, duty to his client, binding him to exert every faculty and privilege and power in order that he may maintain that client's right, together with duty to the court and himself, binding him to guard against abuse of the powers and privileges intrusted to him, by a constant recourse to his own sense of right." These were the principles adopted in this celebrated judgment, and upon which the conclusion was founded that the express promise of the client to pay the advocate " did not constitute any legal obligation." The question was directly presented, and was directly decided ; and that such was the rule of the common law I have not a particle of doubt, so that if that was

the aspect of the question now presented to this court, I should be in no doubt how to decide, for I should feel that I had not the power, and I certainly should not have the inclination, to put aside a rule which has been so long established, and which carries with it all the authority that wisdom and learning can impart. But this subject is no further within the scope of the present inquiry than for the purpose of showing the exact limits of the doctrine that an obligation to pay for legal services cannot, with respect to the advocate, be put in the form of a legal obligation, for, as we have seen, such inability does not reach to others besides advocates. So sharply is the boundary of such disability defined, that in the case just referred to, it is shown, by a reference to decisions, that even barristers can enter into legal compacts, with respect to their compensation, in other matters than those of advocacy, and Chief Justice Erle says that his proposition " is confined to incapacity for contracts concerning advocacy in litigation." It seems to me clear, therefore, that such incapacity does not appertain to the office of attorney, and that the contracts of this class of persons touching their services cannot be impugned simply on the ground of their supposed incompetency to bind themselves or others in such matters. I have already said that such contracts will be inspected with jealous vigilance by the courts, on account of the delicacy of the relationship of the parties to them, and the most transparent candor and good faith is required on the part of the attorney in these dealings with his client; and on such occasions, a court of equity is ever on the alert, for, as was said by Lord Hardwicke, in the case of *Saunderson* v. *Glass*, 2 *Atk.* 296, " if an attorney, *pendente lite*, prevails upon a client to agree to an exorbitant reward, the court will either set it aside entirely, or reduce it to the standard of those fees to which he is properly entitled;" but, subject to these safeguards, I can find no ground for saying that such a general restraint is imposed on an attorney, with respect to contracts for his remuneration, as is inherent in the office of the advocate.

Before closing my remarks on this head, I will add the ob-

servation that the American decisions on the subject have not been overlooked, and that it is quite understood that the weight of such decisions is in favor of considering the English doctrine relating to this topic, even as it relates to advocates, as obsolete and inapplicable to the times. All I wish to say is, that I cannot concur in this view, for the rule in question has always flourished in full vigor as a part of the common law, and has never, during any interval of time, fallen into disuse; and that as its only foundation was its supposed efficacy in sustaining the honorable standing of the advocate, I can by no means admit that such a rule is alien to the professional ethics of this country. The principle that the advocate cannot stipulate with his client for his perquisites, is one of the established customs of our inherited jurisprudence, and is entirely consistent with our social conditions, and, therefore, in my opinion, is not to be eliminated except by legislation.

The second objection to the maintenance of this suit is that the agreement sued on is champertous.

The engagement of the client in the present case was that the attorney should, if successful in the suit, be entitled to a certain part of the moneys thus recovered, and such an agreement, I am satisfied, would be champertous by force of the ancient English statutes. It was urged, on the argument, that a stipulation to bear the expenses of the litigation is an essential ingredient in the offence of champerty, and that there was no such stipulation in this case; but the authorities do not sustain, but, on the contrary, they overthrow this contention. Lord Coke, in 2 *Inst.* 564, says, treating of champerty, "an apprentice or attorney cannot contract to have any part of the thing in demand, after the recovery;" and in *Box* v. *Barnaby, Hob.* 117, the similar view of Chief Justice Hobart is thus expressed: "I hold that if an attorney follow a cause to be paid in gross, when it is recovered, that is champerty." The consent of the attorney to give his services, is in effect a stipulation to contribute largely to the ordinary expense of a suit, and, consequently, it would seem to follow, reasoning upon general principles, that such an

Schomp v. Schenck.

arrangement must be deemed illegal wherever the statutes in question are in force. Entertaining this view, the only remaining question is whether the English statutory or common law, touching this subject, has been adopted in this state.

It appears to me safe to say that, upon examination, any inquirer into this branch of jurisprudence will be satisfied that the entire doctrine of maintenance was the product of a state of society very different from that which now exists, or has ever existed, in this state. The entire object of the doctrine was to protect the weak against the oppressions of the powerful, and such an object could be appropriate only in an age when the social adjustments, with respect to rank and prerogative, were incomplete and there was instability in the administration of the laws. There was an epoch in the history of our English ancestors when the influence of power and exalted station was not unfelt even within the precincts of a court of justice, and when, in a contest with such influence, even truth and right could not be sure of prevailing. In such a state of things, it was a matter of the utmost importance that the sale of rights in litigation should be interdicted by rigorous laws, under highly punitive sanctions; and, consequently, we are not inclined to dispute the wisdom of those successive acts of parliament which were from time to time enacted, and which, upon their face and in their phraseology, give evidence of the existence of social conditions entirely foreign to those with which we are familiar. The prohibition of this law is aimed, primarily, at the officers of the king, at the chancellor, treasurer, justices, king's counsellors, clerks of chancery and exchequer, at any of the king's house, clerk or lay, and at pleaders, apprentices, attorneys, and stewards of great men, showing, in its application, the character and the magnitude of the evil to be suppressed, so that it is not a matter of surprise that these laws were liberally expounded by the courts, and that a system was thus gradually established, originally beneficial, but which became, as time passed and social circumstances changed, unduly restrictive of the dealings of men with each other. As was to be expected, as

the times improved and thus these laws became less essential for the protection of the humbler classes, somewhat of the original severity which had been shown in their execution was mitigated, and the scope of their operation was, by judicial construction, contracted. This decline from the primitive rigor in the application of this series of acts, was noticed by Judge Buller, in the case of *Master* v. *Miller*, 4 *T. R.* 320, his comments being expressed in these words : " It is curious, and not altogether useless, to see how the doctrine of maintenance has from time to time been received in Westminster Hall. At one time not only he who laid out money to assist another in his cause, but he that by his friendship or interest saved him an expense which he would otherwise be put to, was held guilty of maintenance. *Bro., tit. "Maintenance,"* 7, 14, 17, &c. Nay, if he officiously gave evidence, it was maintenance, so that he must have had a subpœna or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside, must be expected. Accordingly, a variety of exceptions were soon made, and, amongst others, it was held that if a person has any interest in the thing in dispute, though on contingency only, he may lawfully maintain an action on it. 2 *Roll. Abr.* 115. But in the midst of all these doctrines on maintenance, there was one case in which the courts of law allowed of an assignment of a chose in action, and that was in the case of the crown ; for the courts did not feel themselves bold enough to tie up the property of the crown, or prevent that from being transferred. 3 *Leon.* 198 ; *Cro.* 180. Courts of equity, from the earliest times, thought the doctrine too absurd for them to adopt, and therefore they always acted in direct contradiction to it, and we shall soon see that courts of law also altered their language on the subject very much." From this quotation, it is obvious that the system that had grown up under these laws relating to maintenance was not altogether in harmony with the habits, needs and business of modern life, and this consideration has helped me to the conclusion to which I have arrived, that the doctrine of mainte-

nance has never had a foothold in the jurisprudence of this state. I shall designate, as briefly as possible, the grounds of this opinion.

By the act of November 24th, 1792, (*Pamph. L.* 794,) Judge Paterson was authorized to collect and put in form all the statutes of England and of this state which then remained in force here, and Mr. Griffith, in referring to the revision that was the result of this authority, says that the compiler " omitted, *as inapplicable,* the English statutes relative to the buying and selling of titles. 1 *R.* II., *ch.* 9; 32 *Hen. VIII., ch.* 2. As he did also those against maintenance. 1 *Ed. III., ch.* 14; 20 *El., ch.* 4, &c. Also of " Champerty," 3 *Ed. I., ch.* 25; 28 *Ed. I., ch.* 11." The question then arises, what was the meaning of this omission? I can perceive no other solution except the inference that Judge Paterson considered them neither a part of the statute law of this state, nor as adapted to our circumstances. By the constitution of 1776, it was declared, in Article XXII., " That the common law of England, as well as so much of the statute law as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature ;" and when, therefore, this particular series of acts was not comprised in this accurate and authentic compilation of the laws in force, it seems manifest that such leaving out was a meditated exclusion. If it be said that such a rejection of the statute law did not affect the common law, and that, by the common law, maintenance was prohibited, my answer is, that since the publication of the body of selected laws just referred to, there is no trace of the prevalence of any part of such a doctrine, either in our practice, judicial *dicta,* or decisions. It is obvious that Mr. Griffith inferred that the entire doctrine of maintenance and champerty was thought by Judge Paterson to be "inapplicable" to the polity of this state. And although in some of the older legal digests and commentaries the doctrine of maintenance is said to be a part of the common law, nevertheless I am strongly of the opinion that it would be altogether impracticable to ascertain of what rules

such doctrine consisted, as embodied in that ancient system. To what books are we to have recourse if we would enter on so difficult an investigation ?

The beginning of the statutory law prohibitive of maintenance is coeval with the Year Books, so that all the recorded decisions of the courts which have come down to us upon this subject, consist of an application and construction of such statutes. I know no means of discovering what was the substance or definite form of the legal rules relating to this doctrine existing antecedently to such recorded decisions. If we were to go back to the time of Richard I., the era when legal memory begins, and examine the *rotuli curiæ regis*, we could probably glean not a fragment of useful learning on this theme, and we would certainly obtain nothing that would be serviceable to our inquiry from the pages of the earliest text writers or commentators, for there appears to be no single sentence in any of those works that can be said, unless by an exceedingly fantastic construction, to be applicable at all to this subject. Thus, when the *Mirror* declares that the law opposes itself to all those ministers of the king who maintain false actions, false appeals, and false defences, knowingly, (" *touts ceux ministers le roy, que mainteinont faux actions, faux appeales, on faux defences a escient*") the rational interpretation of such expressions is, that they are prohibitive, not of giving assistance to suits or defences which are believed to be true, which would be maintainance, but of aiding in suits or defences known to be false, which would be acts akin to malicious prosecutions or fraud. Nor can I think that there is any reference to the doctrine of maintenance in those declarations of Bracton and Fleta, that the justices in eyre should inquire into the misfeasances of sheriffs and other bailiffs in stirring up suits with a view to their own gain, " *per quod justitia et veritas occultetur.*" And yet it is out of such materials as this, thus obscure and indefinite, that the law of maintenance is to be fashioned, if it is to be sought behind the statutes and their explanations by the courts. The truth is, there is the best reason for believing that the entire law of maintenance, re-

garding it as an intelligible subject, is the creature of the English statutory law, and of the judicial constructions of such law, and the consequence is, that when this set of acts was. designedly left out of our statute book, there existed no rational ground for the contention that any part of this law of maintenance, in any form, remained in force in this state. And it is also certain that if these English acts had been incorporated in the compilation authorized by the statute of 1792, they would have had but a mutilated and imperfect operation, for our courts of common law, from earliest times, have, by force of their inherent equitable powers, protected the rights of an assignee of a chose in action ; and lands, the title to which was in dispute, or the possession of which was adversely held, could be conveyed by a deed of bargain or sale, by force of the statute passed March 17th, 1713–14, which gives to the grantee to uses "as full and ample possession " as if he were "possessed thereof by solemn livery of seizin and possession." With these subjects taken out of the field of its operation, it may well be concluded that Judge Paterson was led to the conclusion that this system that had been built up in England, which was intended to prevent the acquisition of any right to litigate, or any interest in such right, would be but a disturbing force, and unsymmetrical if introduced in the body of our laws, that were, in a considerable degree, constructed on an opposite theory.

These are some of the principal considerations from which I have concluded that the doctrine of maintenance does not prevail in this state, and that, as a consequence, the contract sued on cannot be avoided on this ground.

The jury having found this contract to be devoid of deception or fraud, the only inquiry remaining is as to its meaning. I cannot agree to the construction put upon it. I think the fair interpretation is, that the plaintiff was to take the entire charge of the case of the defendant then in litigation, and this, I think, implied that the defendant was to be at no further expense, with respect to lawyer's fees, and it was therefore incumbent on the plaintiff to employ, at his own

charge, such counsel as was needful, as he was not capacitated to argue the matter in his own person. The fees actually paid for such counsel by the defendant are to be charged to the plaintiff. So the moneys paid to the plaintiff out of the estate, must be deducted; he had no right to these, by reason of his agreement, and with the knowledge of the existence of such agreement, it is not at all likely that the surrogate-general would have ordered such allowances, unless upon the footing that they should operate in ease of the defendant. The defendant is entitled to a credit to the extent of such allowances.

Neither do I think the plaintiff can claim any percentage on the moneys derived or to be derived from the real estate. The contract did not touch such real estate; it related to the suit then pending, which altogether pertained to the personalty. The language of the agreement, as proved by the plaintiff himself, is extremely clear to this effect.

If the plaintiff is willing that these deductions shall be made, the verdict may stand for the residue; otherwise, let the rule be made absolute.