8 N.J. Super. 351 (1950)
72 A.2d 901
THOMAS W. HUGHES, PLAINTIFF,
v.
RUDOLPH EISNER, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 20, 1950.
*352 Miss Dorothy V. Reeve, for the plaintiff.
Mr. William Reich, for the defendant.
JAYNE, J.S.C.
The ancient doctrine of maintenance and champerty has had an interesting statutory and decisional lineage. In the passage of time the doctrine has lost most of its original animation and rigor. Indeed as early as 1792 it was determined to be "inapplicable" to the policy of this state. Schomp v. Schenck, 40 N.J.L. 195 (Sup. Ct. 1878). It seems, too, that courts of equity, from the earliest times, regarded the doctrine as "absurd" and declined to adopt it. Master v. Miller, 4 T.R. 320.
The present case projects for judicial consideration the propriety of a contingent fee agreement. The validity of such contracts has been sustained by the courts of this State. *353 Hassell v. Van Houten, 39 N.J. Eq. 105 (Ch. 1884); Wilson v. Seeber, 72 N.J. Eq. 523 (Ch. 1907); Soper v. Bilder, 87 N.J. Eq. 564 (Ch. 1917); Metropolitan Life Ins. Co. v. Poliakoff, 123 N.J. Eq. 524 (Ch. 1938); American Automobile Ins. Co. v. Niebuhr, 124 N.J. Eq. 372 (Ch. 1938); Marsh v. Murphy, 129 N.J. Eq. 302 (E. & A. 1941); In re Archdeacon, 134 N.J. Eq. 535 (Prerog. Ct. 1944).
Concisely stated, the relationship between an attorney and his client is conceived to be of a confidential and fiduciary nature. Thus, a court of equity may inquire into the fairness and reasonableness of a contract entered into by them during the period of such relationship concerning the compensation of the attorney for his professional services, and it may, if warranted, exercise its power to revise or indeed cancel such a contract. Brown v. Bulkley, 14 N.J. Eq. 451 (Ch. 1862); Porter v. Bergen, 54 N.J. Eq. 405 (E. & A. 1896); Kelley v. Schwinghammer, 78 N.J. Eq. 437 (Ch. 1911); Raimondi v. Bianchi, 100 N.J. Eq. 448 (Ch. 1926); reversed, 102 N.J. Eq. 254 (E. & A. 1928); Grimm v. Franklin, 102 N.J. Eq. 198 (Ch. 1928); affirmed, 146 A. 914 (E. & A. 1929); Proff v. Shirvanian, 110 N.J. Eq. 639 (Ch. 1932); Dwyer v. Anderson, 113 N.J. Eq. 210 (Ch. 1933); Lewis v. Morgan, 132 N.J. Eq. 343 (Ch. 1942); Bolte v. Rainville, 138 N.J. Eq. 508 (E. & A. 1946); Steiner v. Stein, 2 N.J. 367 (Sup. Ct. 1949).
A canon of professional ethics adopted by the American Bar Association in 1908 states:
"A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of a court, as to its reasonableness."
In such an inquiry, the attorney must assume the burden of establishing that the agreement was obtained in good faith and upon full disclosure, that the stipulated remuneration was fair and reasonable in the circumstances, and that he performed the services contemplated. Brown v. Bulkley, *354 supra; Grimm v. Franklin, supra; Bolte v. Rainville, supra. See, also, Shoup v. Dowsey, 134 N.J. Eq. 440 (Ch. 1944).
In weighing the fairness of the contingent fee, consideration must be given to such relevant elements as the hazards of the litigation implicating the uncertainty of the attorney's compensation, the difficulties, legal and factual, of sustaining the cause of action such as the novelty of the issue, the character and extent of the professional services contemplated and performed, the expenses disbursed, the time devoted, the result achieved through the efforts of the attorney, such as the amount of damages recovered, the experience, skill and professional standing of the attorney.
It was explained in Soper v. Bilder, supra, that "There is no yardstick by which the value of legal services can be measured; no rate per diem or percentages can be employed with justice to both parties. The legal ability of the attorney, the amount of work which he does, the skill with which he does it, and, of much importance, the amount involved, and the success of his efforts. There may also be considered the contingency that in case he is unsuccessful he will receive nothing, and the fact, if it be a fact, that the fund was created through the efforts of the attorney."
Whether the financial inability of the client to pay a retainer and to defray the expense of the litigation is also a factor to be considered is a subject concerning which there is a diversity of authority.
Basically, however, there must be in these cases some similarity of balance in the appreciation of the rights of the respective parties nothwithstanding the position of superiority which the attorney is deemed to occupy. While an attorney will not be permitted to take an unfair advantage of his client, similarly a client will not be allowed to take an improper advantage of his attorney.
It was in 1938 that the plaintiff concluded that he had contracted a form of pneumoconiosis, more generally known as silicosis, while in the pursuit of his employment by Eureka *355 Flint & Spar Company, Inc. On August 5th of that year he consulted the defendant and engaged him in an effort to obtain some recompense from his employer for his affliction.
A memorandum bearing that date is expressive of the initial engagement. It reads:
"I, Thomas W. Hughes, residing at 1029 South Olden Avenue, Trenton, New Jersey do hereby retain Rudolph Eisner as my attorney to represent me in connection with my claim against Eureka Flint & Spar Co., Inc., Trenton, New Jersey for damages due to contraction by me of Silicosis while employed by said firm. I further agree to pay him out of the proceeds of any recovery, whether by settlement, suit or otherwise, reasonable compensation for his services. Any settlement which he shall make shall be subject to my approval, but I hereby authorize him to conduct negotiations therefor and to file suit if and when he shall deem the same advisable in my behalf.
"(Signed) Thomas W. Hughes."
The defendant forthwith investigated the circumstances of the plaintiff's claim and endeavored to persuade the plaintiff's former employer to agree upon a settlement. The employer disclaimed liability but was disposed to pay to the plaintiff the sum of $200 to avoid litigation. The offer was rejected.
In November, 1938, the defendant informed his client that he had exhausted his endeavors to obtain an acceptable settlement and that the institution of an action in his behalf was the only available expedient. The defendant, however, explained to him that the prosecution of an action of such a novel type would be costly and the outcome uncertain, and that for those reasons he would not be willing to assume the task unless the plaintiff agreed to pay him a fee of 50 per cent of any sum which might possibly be recovered either by suit or by settlement. The plaintiff undoubtedly acceded.
"WHEREAS I, THOMAS W. HUGHES, realize that the prosecution of my action to recover damages for silicosis against Eureka Flint & Spar Co., Inc., in the Mercer County Circuit Court has involved and will involve considerable skill, effort and expense upon the part of my counsel, Rudolph Eisner, and
"WHEREAS I am unable to advance any money for costs incurred in connection with said suit and have requested Rudolph Eisner to accept said case upon a contingent basis:
*356 "I hereby agree to pay to Rudolph Eisner for his services in connection with the prosecution of said suit by him, after deduction by him of taxed costs and any disbursements incurred by him in connection with said action, fifty per cent of such amount as may be recovered from the defendant in satisfaction of said claim, whether by settlement or otherwise, payable out of the proceeds. I hereby authorize said Rudolph Eisner to retain such associate counsel as he may deem advisable, and that he shall pay such counsel out of his own fee. This contract is made in consideration of the undertaking by Rudolph Eisner to prosecute said action.
 "Dated: November 21, 1938.
 "(Signed) Thomas W. Hughes.
"I have read the foregoing agreement and I understand the terms thereof.
 "(Signed) Thomas W. Hughes.
 "Witness to signatures
 of Thomas W. Hughes:
 "(Signed) Edythe Vanderbilt."
While the agreement just exhibited is not the final one to which the present case particularly relates, yet its execution has a measure of significance in that it provides for the payment of a larger fee than that agreed upon in the final compact. The plaintiff shrewdly conceived that its admission might be prejudicial to his present contention and stupidly denied at the trial that he signed it. In his complaint in this case the November agreement is alleged to have been made. The signature is manifestly his. His cunning indulgence in deliberate falsehood in that respect has prostrated my confidence in the credibility of his testimony in other particulars. Deception seems to have many instrumentalities, but a lie is the handle that fits them all.
The fact is that the action contemplated by the agreement was promptly instituted in the former Mercer County Circuit Court.
It is in point to recall that in 1938 silicosis was not conclusively recognized as an occupational disease compensable under the terms of the Workmen's Compensation Act. It was not thought to be the result of an accident. Smith v. International High, &c., Co., 98 N.J.L. 574 (E. & A. 1923); Ziegler v. Henry Maurer & Son, 15 N.J. Misc. 659 (Sup. Ct. 1937). See R.S. 34:15-35.1 et seq.
*357 In its common law character, an action against an employer for negligently causing such an injurious condition seemed to project the issue as to when the cause of action accrued. The plaintiff had been in the employ of the Eureka Company from November, 1920, until July 26, 1938. His employer consequently pleaded the statute of limitations. Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 200 N.E. 824 (Ct. of Appeals 1936). The present defendant thereupon on behalf of his client, the plaintiff, moved to strike from the answer of the Eureka Company the defenses invoking the statute. Obviously, if the plaintiff in his situation was barred from recovering any damages from his employer for any alleged dereliction which occurred prior to two years before the commencement of the suit, the maintenance of his cause of action would be exceedingly precarious. Mr. Justice Oliphant, who was then Circuit Court Judge before whom the motion was made, commented: "This presents a difficult problem." He resolved that the alleged wrong "should be treated as single and continuous, not plural and discrete" and that "the statute begins to run from the last date of employment." Hughes v. Eureka Flint, &c., Inc., 20 N.J. Misc. 314 (Cir. Ct. 1939).
The defendant thus achieved an eventful and most advantageous legal victory for his client. The plaintiff's employer evidently became alarmed and peace overtures were consquently forthcoming. Mr. Eisner consulted at his own expense on several occasions with the law firm of Collins and Corbin in the preparation of the case for trial.
A narrative of the progressive negotiations for settlement is unessential. The terms of the final settlement of the litigation are evidenced by an elaborate agreement in writing dated July 2, 1940, from which I quote the following paragraphs:
"1. The Company agrees to pay to Claimant the sum of Twenty-five Hundred Dollars ($2500.00) in cash payable as follows: $300.00 upon or prior to the execution of this agreement, the receipt of which $300.00 is hereby acknowledged by Claimant; $200.00 on June 30, 1940 and equal installments of $200.00 upon the last day of each *358 and every month thereafter until said sum of $2500.00 shall have been paid in full as aforesaid to Claimant.
"2. The Company in addition to said payments, hereby agrees to pay to Claimant the sum of Ninety Dollars ($90.00), representing three weekly payments of $30.00 each due respectively on May 31, 1940, June 7, 1940, and June 14, 1940, the receipt of which $90.00 upon or prior to the execution of this agreement is hereby acknowledged by the Claimant, the sum of Thirty Dollars ($30.00) on June 21, 1940, and an equal sum of Thirty Dollars ($30.00) per week payable on Friday of each and every week thereafter so long as Claimant shall live. In the event that Claimant shall die within five (5) years from the date of execution of this agreement (unless such period is extended as hereinafter provided), the Company, during the remainder of such five year period, shall pay the weekly payments of $30.00 each to which the Claimant would have been entitled hereunder had he so long lived, to the following persons in the priority named: to Claimant's wife, Frances Hughes; or, if she die prior to payment to her of all of said weekly installments as aforesaid, then, to such of Claimant's present children as shall then be surviving; or, if none of Claimant's children shall be then surviving or if all of them shall thereafter die, then to Claimant's executor or administrator. In the event that Claimant, prior to the expiration of such five year period, shall be employed by the Company, the computation of such five year period shall be suspended during the term or terms of Claimant's employment by the Company, so that such five year period shall be extended by the total length of time during which Claimant shall have been employed by the Company prior to the expiration of such extended five year period. In the event that Claimant shall die prior to the expiration of such five year period extended as aforesaid, the Company, any provision hereinbefore contained to the contrary notwithstanding, shall make said weekly payments of $30.00 each during the remainder of such extended five year period to the same persons and in the same manner as hereinbefore provided in the event of Claimant's death within the five year period.

* * * * * * *
"4. The Company agrees to maintain for the benefit of the Claimant and his beneficiaries and representatives as designated therein, Group Insurance Policy No. G4132, Certificate No. 12 in The Prudential Insurance Company of America in the sum of $2000.00 upon the life of Claimant, which policy is now in force, and the Company agrees to pay all premiums to become due thereunder until Claimant's death, which premium payments heretofore or hereafter made, together with the full proceeds of said policy, shall be in addition to all other obligations herein provided to be performed by the Company. Nothing contained in this paragraph, however, shall require the Company to maintain said policy in force contrary to the provisions thereof with respect to employment of the insured employee by the Employer.

* * * * * * *
*359 "11. Upon execution of this agreement, Samuel D. Lenox, Esq., and Rudolph Eisner, Esq., the respective attorneys for said Company and Claimant, shall prepare a stipulation in such form as they deem proper, preserving Claimant's rights in said suit pending performance by the Company of all the covenants of this agreement, and shall file such stipulation in said cause which is still pending."
The settlement agreement containing 14 lengthy paragraphs is conspicuously evidential of the meticulous care and foresight with which it was composed in the interest of and for the security of the plaintiff, his wife, and family.
Shortly before the execution of the settlement agreement, and in view of the terms of the proposed compromise, the plaintiff and Mr. Eisner discussed the manner in which the latter's fee would be paid. Two memoranda were prepared and signed by the plaintiff, the one dated June 14, 1940, and the other, June 18, 1940. Since the plaintiff denies that he signed the November memorandum, the following quotation contained in the memorandum of June 14, 1940, attracts attention:
"I understand further that you are willing to revise the present agreement between us concerning your fee, which now provides for 50% of the total amount realized for my case, whether by judgment or settlement, plus return of any disbursements advanced by you."
The ultimate agreement concerning the defendant's fee which is here impugned, although bearing date June 18, 1940, was probably signed by the plaintiff on July 2, 1940, as indicated by the date appearing in the jurat of the plaintiff's accompanying affidavit. Only those portions of the writing of immediate relevancy need be reproduced:
"I understand that you are negotiating a settlement of my case against Eureka Flint & Spar Co., Inc., hereinafter referred to as `Company,' which will provide, among other things, for payment of $2500 (payable $300 down and $200 per month thereafter), for additional payments to me during life of $30 per week and, if I should die within 5 years, to my wife for the balance of such period, and for maintenance by the Company of a group insurance policy upon my life in the sum of $2000.
*360 "In consideration of your skill and services in the prosecution of my said case and the negotiation of said settlement, including services still to be performed in connection therewith, I hereby agree to pay to you out of the monies to be paid by the Company under said settlement agreement, fifty per cent of the $2500 plus one-third of each and every weekly payment of $30 payable thereunder plus no per cent of the proceeds of said group insurance policy. * * *"
In his affidavit at the extremity of the agreement the plaintiff deposed that "he signed the foregoing agreement, that he has carefully read and considered and understands the contents thereof, and that the contents of this affidavit have been read to him prior to his signing of said agreement."
The plaintiff now declares that the fee agreement was the consequence of coercion practiced upon him by the defendant. I do not believe him. He had previously agreed to pay a contingent fee of 50%. It is not likely that coercion was required to induce him to consent to a reduction. The eventuality generates the conjecture that in 1940 all parties concerned with the litigation misjudged the plaintiff's actual life expectancy.
It is a natural initial and incogitant inclination to regard with disapproval a contingent fee agreement which enables an attorney to collect a stipulated percentage from the weekly payments which are to be made to his client during the period of the latter's life.
But upon cool reflection, is such a contract ethically or legally baneful if voluntarily and deliberately entered into without deception, undue influence, and dominance, and with an intelligent appreciation of its terms, in a case in which it is evident that an impecunious client would not be receiving the payments currently, had it not been for the skillful endeavors of the attorney? I am disinclined to declare that an agreement of such a nature is intrinsically invalid solely for reasons of public policy.
Vice-Chancellor Berry in Grimm v. Franklin, supra, remarked: "While it is proper for this court to fix the reasonable fees to be paid an attorney by his client where charges of fraudulent or unfair conduct are preferred, when the parties *361 themselves have come to an agreement touching such fees, and it appears that the agreement was arrived at after complete disclosure and full consideration, and that there was no fraudulent or unfair conduct on the part of the attorney, and that, as to the client, the agreement is fair, that agreement ought not to be disturbed by the court, but the parties should be left where they have placed themselves."
My factual findings in the present case are that the plaintiff fully understood the import and significance of all of his transactions with the defendant. Copies of the several agreements were in his possession. He subsequently manifested his continued confidence in the defendant by engaging him to prepare his will. The plaintiff has in pursuance of the terms of the last agreement continuously collected and paid to the defendant his one-third share of each of the instalments periodically maturing. The defendant collected each week for the plaintiff the $30 check from the Eureka Company which he forthwith forwarded to the plaintiff, who thereupon by his own check remitted $10 to the defendant. The plaintiff has pursued that practice for almost a decade.
Because of the relationship of attorney and client, there is, however, the philosophical opinion to which Vice-Chancellor Lane alluded in Soper v. Bilder, supra, that contingent fee contracts, although accorded validity, will be sustained only to the extent of securing to the attorney a reasonable compensation for his professional services.
In the instant case the plaintiff, according to the state of the account at the time of the trial, has received $11,330 net. The defendant has received one-half of the $2,500 and one-third of the weekly payments which have amounted to $15,120. The defendant has accordingly collected a fee of $6,290.
While I acquit the defendant unqualifiedly of all the accusations of the plaintiff and find no justification of a strictly legal character for rescinding the agreement, yet I cherish the persuasion that the practice of law must continue predominantly to be a profession distinguishable from a speculative *362 financial enterprise. Discords between attorneys and clients respecting fees for professional services are traditionally undesirable.
This case exemplifies the wisdom incorporated in the ancient doggerel:
 "When your patient abed is lying,
 Or your client's case you're trying,
 That's the time to collect your fee.
 "For when the patient hath recovered,
 Or the lawsuit's won or smothered,
 He will never think of thee."
Upon a comprehensive scrutiny of all the circumstances of the present case, it is my conclusion that the aggregate sum thus far received by the defendant does not constitute an unconscionable or manifestly exorbitant remuneration for his successful professional services, but it is my conviction that the defendant should forego any additional charge against the plaintiff.
Judgment accordingly, without costs to either party.