IN THE MATTER OF THE APPLICATION OF PHILIP J.
LiVOLSI, PETITIONER.

Argued October 6, 1980—Decided April 13, 1981.

*Leonard J. Wood* argued the cause for petitioner (*Console, Marmero and LiVolsi,* attorneys).

*Bernard F. Conway* argued the cause for *amicus curiae,* New Jersey State Bar Association.

*Andrea M. Silkowitz,* Deputy Attorney General, argued the cause for the State of New Jersey (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

WILENTZ, C. J.

This case involves challenges to the constitutionality and desirability of the Fee Arbitration Committees (Committees) established by this Court in *R.*1:20A pursuant to our constitutional authority to regulate the practice of law. The Rule's purpose was to provide a satisfactory mechanism for the resolution of fee disputes between attorneys and their clients. As presently constituted, a Committee must arbitrate fee disputes upon a client's request (whether the lawyer consents or not), or upon a lawyer's request if the client consents. *R.*1:20A–3(a). The Committee's determination is binding on both client and attorney, and is unappealable. *R.*1:20A–3(a)(c)(d). The proce-

dures of the Committee are essentially the same as those of District Ethics Committees. *R*.1:20A–3(b).

Petitioner LiVolsi and *amicus* New Jersey State Bar Association (Association) contend that *R*.1:20A is unconstitutional for four reasons: that promulgation of *R*.1:20A is beyond the Supreme Court's authority under *N.J.Const.* (1947), Art. VI, § II, par. 3; that it denies lawyers equal protection of the laws; that it denies attorneys the right to trial by jury guaranteed by the New Jersey Constitution; and that the unappealability of Committee determinations violates both the due process clause of the Fourteenth Amendment and the New Jersey Constitution. We reject these contentions and uphold the validity of *R*.1:20A. We also reject the Association's argument that the compulsory nature of Committee arbitrations is undesirable and reaffirm our commitment to *R*.1:20A.

I.

## PROCEDURAL BACKGROUND AND JURISDICTION

Petitioner, a member of the New Jersey Bar, brought an action against this Court in the United States District Court, District of New Jersey, challenging the constitutionality of *R*. 1:20A. While this action was pending, we invited petitioner to bring his challenge before our Court. Petitioner agreed to do so and on April 2, 1979, exercising original jurisdiction over this matter, we permitted petitioner to file a petition directly with this Court "for a determination of the constitutionality of *R*. 1:20A and further, to determine the intended scope and meaning of the aforementioned Rule." Order of April 2, 1979. Subsequently, petitioner filed a brief in support of his claim, and an *amicus* brief was filed by the Association supporting his position. A brief in opposition was filed by the Attorney General.

■ Although none of the parties before us challenges the procedure by which we are hearing this petition, we feel it necessary to explain this rather unusual exercise of our original jurisdiction. This Court is, of course, primarily an appellate

body, *N.J.Const.* (1947), Art. VI, § II, par. 2.[1] It could be argued that we are *exclusively* an appellate body because the only explicit grant of original jurisdiction to this Court comes from *N.J.Const.* (1947), Art. VI, § V, par. 3,[2] which permits original jurisdiction "as may be necessary to the complete determination of any cause on review." Plainly, this provision grants us original jurisdiction only over matters related to causes already before us. *See, e. g., Kelly v. Curtiss,* 16 *N.J.* 265 (1954); *City of Newark v. West Milford Twp.,* 9 *N.J.* 295 (1952).

We find, however, that *N.J.Const.* (1947), Art. VI, § II, par. 3,[3] provides this Court with an independent basis for exercising original jurisdiction in the case before us. This provision grants us "jurisdiction" over the "discipline of persons admitted" to the Bar. It is the source of our exclusive power over the practice of law. *State v. Rush,* 46 *N.J.* 399, 411–12 (1966). We have recently held that the Supreme Court, acting pursuant to that power, has the authority to initiate disciplinary proceedings on its own as well as to review those conducted by Ethics Committees. *In re Loring,* 73 *N.J.* 282, 289 (1977). We have also held that this power enables us to adjudicate a dispute about the unauthorized practice of law even though the party

---

[1]This paragraph provides:

> The Supreme Court shall exercise appellate jurisdiction in the last resort in all causes provided by this Constitution.

[2]This paragraph provides:

> The Supreme Court and the Appellate Division of the Superior Court may exercise such original jurisdiction as may be necessary to the complete determination of any cause on review.

[3]This paragraph provides:

> The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.

seeking relief might not have traditional standing. *In re Estate of Margow*, 77 *N.J.* 316, 323 (1978).[4]

These cases, recognizing that this Court's plenary constitutional authority includes original jurisdiction over cases involving the "disciplining" of attorneys, imply that we also have original jurisdiction over challenges to the methods by which we exercise constitutional authority. It would make little sense for us to have original jurisdiction over the appropriateness, or the constitutionality, of disciplining individual attorneys while challenges to the constitutionality of our agencies, such as the Committees, must necessarily go first to Superior Court. The constitutional provision, Art. VI, § II, par. 3, must be read as vesting original, as well as appellate, jurisdiction in this Court over all matters concerning our authority to "discipline" the Bar.[5] We therefore hold that we may exercise original jurisdiction over this challenge to *R.*1:20A.

## II.

## CONSTITUTIONALITY OF *R.*1:20A

A. *The Power of this Court to Promulgate R.1:20A*

There is something almost anachronistic about the challenge to the Court's power to adopt *R.*1:20A under the New Jersey

---

[4]*Margow* itself did not involve an "original jurisdiction" problem because there the complainant had first gone to the County Court, Probate Division, for redress. However, the Court's willingness in that case to bypass traditional standing requirements because it was acting under its Art. VI, § II, par. 3 authority supports the conclusion that this constitutional provision gives the Supreme Court unusually broad jurisdiction in this area.

[5]Another case that involves this Court's expansive authority under Art. VI, § II, par. 3 is *In re Gaulkin*, 69 *N.J.* 185 (1976). *Gaulkin* involved a challenge to the Court's determination that judges' spouses must refrain from political activity. The Court found it had the authority to hear the challenge originally under the quasi-legislative power granted it by Art. VI, § II, par. 3 to "formulate court rules and policy." *Id.* at 188. The Court in *Gaulkin* emphasized, however, that it was engaged in rule-making pursuant to Art. VI, § II, par. 3 and not in a traditional adjudication. Our legislative power is involved in this case as well, since we were asked to change *R.*1:20A as a matter of policy, regardless of its constitutionality.

Constitution. For 33 years this Court has exercised plenary, exclusive, and almost unchallenged power over the practice of law in all of its aspects under *N.J.Const.* (1947), Art. VI, § II, par. 3. The enormous scope of this power puts *R.*1:20A in proper perspective. Though critically important, it is but a minor regulation of the practice of law compared to others whose validity is beyond dispute.

The heart of the constitutional provisions concerning the judicial system was the concentration of responsibility for its proper functioning in the Supreme Court and Chief Justice. Such responsibility requires appropriate power over courts, judges, practice and procedure, *and* lawyers. Responsibility for an adversarial judicial system requires responsibility for the adversaries, and control over both.

In exercising this responsibility, one of the many goals this Court has sought to achieve has been maintaining public confidence in the judicial system. The intended direct beneficiary of that system is the litigant, the client, who can realistically gain access to it only through his relationship with a lawyer. The value of the judicial product depends upon the effectiveness of this access, the effectiveness of this relationship. If lawyers refuse to represent, the judicial system is almost worthless; if the terms and conditions of representation are unfair, the judicial system is impaired to that extent. This dependency of the public's confidence in the judicial system on its satisfaction with lawyer-client relationships is not theoretical: those dissatisfied with the system include a fair proportion dissatisfied with their lawyer. The most common cause of that dissatisfaction concerns fees, *see* section IIIA, *infra*.

Given the critical importance of the constitutional power of this Court over the practice of law, and its pervasiveness, starting with admission, ending with disbarment, and covering everything in between, we have no doubt that the power extends to every aspect of fee agreements between lawyers and clients. If this Court can set a limit on fees for certain matters,

*American Trial Lawyers v. New Jersey Supreme Court,* 66 *N.J.* 258 (1974) (upholding the contingent fee schedule promulgated in *R.*1:21–7); require service for no fee at all in others, *State v. Rush, supra,* 46 *N.J.* at 411–12 (noting this Court's authority to require attorneys to defend indigents without charge); and disregard completely fee agreements in *all* matters (if they are unreasonable), *Steiner v. Stein,* 2 *N.J.* 367, 372 (1949) (*see* section IIC, *infra*); if, in short, this Court has the authority to control the substance of the fee relationship, then a power of a lesser magnitude—determining the procedure for resolving fee disputes—must also be within our province.[6]

B. *The Equal Protection Claim*

■ Petitioner maintains that his right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution is violated by *R.*1:20A. This Rule, it is argued, unconstitutionally "singles out" attorneys from among professionals who provide fee-based services for compulsory arbitration. We find no support for this argument in federal constitutional law.

Since lawyers are not a protected "suspect class," and since there is no recognized fundamental right being infringed upon by *R.*1:20A, there need be only a rational basis supporting the difference in treatment. *See San Antonio Ind. School Dist. v. Rodriguez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.2d* 16 (1973). We find that such a rational basis plainly exists in the need to assure the reasonableness of attorney-client fees by providing a swift, inexpensive remedy to correct unreasonable fees. As the

---

[6]The Association also claims that compulsory fee arbitration is inconsistent with *N.J.S.A.* 2A:13–6 which guarantees lawyers the right to "commence and maintain an action for the recovery of reasonable fees." We disagree. First, the Legislature could not interfere with a legitimate exercise by this Court of its constitutional authority to regulate the Bar. Second, *R.*1:20A provides only a mechanism for determining what a "reasonable fee" is. The rule itself recognizes the attorney's right to sue in court for a fee once its reasonableness has been determined by a Committee. *R.*1:20A–3(a).

United States Supreme. Court has recognized, the state has a special interest in regulating the legal profession and attorney-client relationships. *Goldfarb v. Virginia State Bar Association*, 421 *U.S.* 773, 792, 95 *S.Ct.* 2004, 2015, 44 *L.Ed.*2d 572 (1975). *See In re Logan*, 70 *N.J.* 222, 229–30 (1976).

C. *The Right to Jury Trial*

 Petitioner and the Association maintain that *R.*1:20A unconstitutionally denies attorneys the right to trial by jury guaranteed by *N.J.Const.* (1947), Art. I, par. 9.[7] We disagree, on the two grounds that in New Jersey attorneys never had an absolute right to trial by jury in fee dispute cases and that recognizing a jury right in such cases would undermine our constitutional authority to regulate the Bar.

*N.J.Const.* (1947), Art. I, par. 9, provides that "[t]he right of trial by jury shall remain inviolate . . . ." This provision guarantees a jury trial only to the extent the right existed at the time of the adoption of the 1947 Constitution. *See Steiner v. Stein, supra,* 2 *N.J.* at 378–79. Petitioner therefore must establish that before 1947 attorneys had a right to a jury trial in cases involving fee disputes with their clients.

Petitioner and the Association maintain that fee disputes are essentially nothing more than contract disputes for money. Since, they argue, such disputes have always been considered "legal" as opposed to "equitable," and since litigants always had a right to jury trial of "legal" matters, attorneys always had the right to jury trial in fee dispute cases. Support for this position can be found in *Steiner,* where this Court stated that "[attor-

---

[7]Petitioner also contends that attorneys are guaranteed jury trials by the Seventh and Fourteenth Amendments to the United States Constitution. This contention is incorrect. The United States Supreme Court has specifically held that the Seventh Amendment's guarantee of a jury trial in civil cases is not incorporated into the Fourteenth Amendment and is therefore not applicable to the states. *Minneapolis & St. Louis R.R. Co. v. Bombolis,* 241 *U.S.* 211, 36 *S.Ct.* 595, 60 *L.Ed.* 961 (1916). *See Fisch v. Manger,* 24 *N.J.* 66, 74–75 (1957).

ney-client fee disputes] are actions for breach of contract and the parties were and are entitled to a trial by jury as of right." 2 *N.J.* at 372.

The Court in *Steiner* went on, however, to recognize that, because "an attorney's position of trust as an officer of the court obligated him to the highest standard of fair dealing," New Jersey courts of equity have traditionally exercised jurisdiction "at the behest of the client" to "revis[e] or cance[l] contracts for services" and to "determin[e] the just and reasonable sum due the attorney from his client." *Id.* The Court noted that equity courts have gone so far as to "restrain actions at law" in order to exercise this jurisdiction, but that the equity courts have stayed their hand when a client has already "had his day in a court of law." *Id.*

Our canvass of the pre-1947 case law strongly supports the Court's findings in *Steiner* that New Jersey equity courts have always had broad powers to adjudicate attorney-client fee disputes on behalf of the client. In *Lewis v. Morgan*, 132 *N.J.Eq.* 343 (Ch.1942), for example, a client brought an action in equity to enjoin prosecution by his attorney of a suit at law to recover attorney fees. The client wanted the Chancery Court to review the reasonableness of the fee his attorney sought. The defendant attorney argued that the Chancery Court lacked jurisdiction over the case and that his suit at law should therefore not be enjoined. The court granted the injunction, holding that the "existence of a confidential relationship between an attorney and client has been recognized from the earliest times and it must now be acknowledged that the charges of an attorney are *always* subject to the scrutiny and review of this court." *Id.* at 346 (emphasis added).[8] The court added that even if "a client agreed to the estimated amount of the fee to be charged, equity

---

[8]The Court in *Lewis* found as an alternative basis for exercising its jurisdiction the fact that the plaintiff alleged fraud on the part of his attorney.

will investigate the fairness and reasonableness of the contract." *Id.* Similarly, in *Grimm v. Franklin,* 102 *N.J.Eq.* 198 (Ch.1928), aff'd p. c. o. b., 146 *A.* 914 (E. & A. 1929), the Chancery Court enjoined several law suits brought by the defendant attorney against the plaintiff client seeking attorney's fees. There, the court noted the defendant's admission that "the charges of an attorney are *always* subject to scrutiny and review in this court, and that this court has a right now to determine the fairness and reasonableness of the contract [and] the adequacy and propriety of the compensation therein provided for." *Id.* at 204 (emphasis added).[9] *See also Porter v. Bergen,* 54 *N.J.Eq.* 405, 406 (E. & A. 1896) ("Even if it be conceded that the [client] agreed to the [fee], yet a court of equity would not sanction it except upon proof of its perfect fairness"); *Sinisi v. Milton,* 107 *N.J.Eq.* 179 (Ch.1930); *Kelley v. Schwinghammer,* 78 *N.J.Eq.* 437 (Ch.1911); Lewis, "Equity," 4 *Rut.L.Rev.* 274, 275 (1949).[10] As the Court noted in *Steiner,* however, equity courts were not permitted to step in after a law court had already adjudicated a fee dispute. *See Raimondi v. Bianchi,* 102 *N.J.Eq.* 254 (E. & A. 1928).

The rationale behind this broad power exercised by equity courts over attorney-client fee disputes was explained by Justice Heher in *Bolte v. Rainville,* 138 *N.J.Eq.* 508 (E. & A. 1946). Courts, Justice Heher pointed out, recognize the "position of superiority which the attorney occupies over his client [and] [b]ecause of this dominance [equity] raises a presumption against the validity of the transaction [between attorney and client] and casts upon the dominant party the burden of proving

---

[9] Unlike in *Lewis,* the court in *Grimm* did not have any alternative basis such as an allegation of fraud upon which to base its assertion of jurisdiction.

[10] Post-1947 cases have also recognized the powers of equity courts in this area. *See, e. g., Cohen v. Cohen,* 146 *N.J.Super.* 330, 336 (App.Div.1977); *Hughes v. Eisner,* 8 *N.J.Super.* 351, 353 (Ch.Div.1950).

affirmatively his compliance with equitable requisites and thereby overcoming the presumption of invalidity." *Id.* at 515.[11]

These cases establish that prior to 1947 attorneys had no right to prevent their clients from having fee disputes adjudicated without a jury in the courts of equity. They therefore have no such right today since the 1947 Constitution does not purport to *add* any right to jury trial. *Steiner* was not wrong, however, in concluding that fee disputes are essentially legal matters for which a jury is normally guaranteed. If the client does not object, an attorney is entitled to have a jury trial.[12] However, if the client wishes to have the dispute adjudicated without a jury, by a Committee—which is now the tribunal with special responsibility over attorney-client fee disputes[13] —the attorney cannot block the Committee's jurisdiction by asserting a right to trial by jury.

Our conclusion here is buttressed by the fact that recognizing a right in lawyers to demand a trial by jury when clients seek *R.*

---

[11]In *Bolte* itself, the court held that courts of equity could not adjudicate the reasonableness of fees on behalf of an *attorney.* Only a client could claim the protection of equity courts in fee disputes—an attorney was required to seek his remedy at law. *See also Elting v. Frieman,* 89 *N.J.Super.* 433 (App.Div. 1965).

[12]In purely equitable matters, such as suits for injunctions, there is no right to a jury even if both parties want one. *See* Devlin, "Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment," 80 *Colum.L. Rev.* 43 (1980); Note, "The Right to a Nonjury Trial," 74 *Harv.L.Rev.* 1176 (1961).

[13]For purposes of delimiting the attorney's right to a jury, it makes no difference that a Committee is substituted for the equity courts as the tribunal to which a client takes a fee dispute for resolution. Under the pre-1947 Constitution, the equity courts took upon themselves the obligation to oversee this aspect of attorney-client relations. Pursuant to our authority under the 1947 Constitution to regulate the Bar, we have also placed this responsibility in the Committees. A client continues to have the right, post-*R.*1:20A, to require the Chancery Division to adjudicate fee disputes, if he chooses not to invoke *R.*1:20A, or to allow an action at law to determine the outcome.

1:20A arbitration would greatly undermine this Court's constitutional authority to regulate the Bar. As we have determined, *see* section IIA, *supra, N.J.Const.* (1947), Art. VI, § II, par. 3, plainly authorizes us to create the *R.*1:20A compulsory arbitration scheme. If we were to accept petitioner's interpretation of Art. I, par. 9, however, this authority would be meaningless because lawyers could simply block Committee arbitrations by demanding a jury. We decline so to interpret that provision. Just as we would not view the framers of the 1947 Constitution as intending the prerogative writ clause to undermine our authority to regulate the Bar, *see* section IID(2), *infra*, so we decline to ascribe to them an intent to grant lawyers a jury right that would prevent this Court from effectively carrying out its obligation to police the Bar.

D. *The Right to Appeal*

The final constitutional challenge made by petitioner and the Association is to the unappealability of Committee determinations.[14] It is alleged that the right to appeal Committee determinations is guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution and by the New Jersey Constitution. We find no support for a right to appeal here under either Constitution.[15]

---

[14]*R.*1:20A–3(c) provides: "*Appeal.* No appeal from the determination of a Fee Arbitration Committee shall lie."

[15]The fact that Committee determinations are not appealable does not, of course, mean that the parties to a Committee adjudication have no recourse if the Committee violates their constitutional rights. If, for example, in reaching a decision, the Committee violates a party's constitutional rights by discriminating against a party on account of race, a collateral attack against the Committee, in either state or federal court, is always possible. *See, e. g., Mayor of Philadelphia v. Educational Equality League*, 415 *U.S.* 605, 94 *S.Ct.* 1323, 39 *L.Ed.*2d 630 (1974) (challenge brought in federal district court alleging racial discrimination in appointments to the Board of Education Nominating Panel).

### (1) *The United States Constitution*

The due process clause of the Fourteenth Amendment does not require states to provide litigants with a right to appeal adverse holdings by lower tribunals. *Lindsey v. Normet*, 405 *U.S.* 56, 77, 92 *S.Ct.* 862, 876, 31 *L.Ed.2d* 36 (1972); *Griffin v. Illinois*, 351 *U.S.* 12, 18, 76 *S.Ct.* 585, 590, 100 *L.Ed.* 891 (1956). In *Lindsey* and *Griffin*, the Supreme Court was addressing the issue of appeals from lower courts. In other cases, the Court has held that determinations by administrative agencies can constitutionally be made final and unreviewable in the courts. *See Panama Canal Co. v. Grace Line*, 356 *U.S.* 309, 317, 78 *S.Ct.* 752, 757, 2 *L.Ed.2d* 788 (1958); *Switchmen's Union v. National Mediation Board*, 320 *U.S.* 297, 64 *S.Ct.* 95, 88 *L.Ed.* 61 (1943). *See generally* K. Davis, Administrative Law Treatise § 28.16 ("Action Committed by Law to Agency Discretion") (1958), *updated in* Administrative Law § 28.16 (1970 supp.) *and* Administrative Law of the Seventies § 28.16 (1976). Thus, we hold that our decision to make Committee determinations unreviewable in the courts does not violate the due process clause.[16]

### (2) *The New Jersey Constitution*

██ Petitioner and the Association also claim that the New Jersey Constitution guarantees them a right of appeal from Committee determinations. They base this claim on the prerogative writ clause of the New Jersey Constitution, Art. VI, § V, par. 4, and on this Court's holding in *Division 540 v. Mercer County Improvement Auth.*, 76 *N.J.* 245 (1978), requiring judicial review of compulsory arbitrations under the labor arbitration statute, *N.J.S.A.* 40:37A–96. We reject both arguments.[17]

---

[16]For these same reasons, we held in *In re Logan*, 70 *N.J.* 222 (1976), that the due process clause was not violated because there were no appeals from this Court's determinations in disciplinary matters. *Id.* at 228–29.

[17]The Association also cites *Midler v. Heinowitz*, 10 *N.J.* 123 (1952), for the proposition that the New Jersey Constitution guarantees litigants "one appeal as of right to a court of general appellate jurisdiction." *Id.* at 129. *Midler,*

(a) *The Prerogative Writ Provision*

*N.J.Const.* (1947), Art. VI, § V, par. 4, provides:

Prerogative writs ·are superseded, and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, as of right, except in criminal causes where such review shall be discretionary.

It is contended that an appeal in lieu of prerogative writs should lie "by right" from determinations of the Committees just as such appeals lie "by right" from determinations of legislatively created administrative agencies. We reject this contention on two grounds: first, we find no evidence that prerogative writs were ever used to review actions by judicially created agencies such as the Committees; and second, we find that permitting appeals from judicially created agencies to the Superior Court would be inconsistent with this Court's exclusive constitutional authority over the regulation of the Bar.

The prerogative writ clause of the 1947 New Jersey Constitution was intended to streamline and strengthen the traditional prerogative writs which were available in the pre-1947 Supreme Court. The provision first consolidates the old prerogative writs (*certiorari, quo warranto, prohibitions,* and *mandamus*) into one action—which has come to be known as an action "in lieu of prerogative writs." Also, the provision removes the courts' traditional discretion not to hear the writs and makes the new action "in lieu of prerogative writs" available as of right, except in criminal cases. *See Ward v. Keenan*, 3 *N.J.* 298, 303–05 (1949); Jacobs, "Procedure in Lieu of Prerogative Writs," *Rut.L.Rev.* (special number) 34, 38 (1948).

For our purposes here, it is significant that Art. VI, § V, par. 4 did not change the *substance* of prerogative writ appeals when it created the new action in lieu of prerogative writs.

however, dealt only with constitutionally authorized appeals from the lower courts to the Appellate Division. *See N.J.Const.* (1947), Art. VI, § V, par. 2. Neither that constitutional provision nor the *Midler* opinion purports to create a general right to appeal in New Jersey from all non-judicial entities.

Actions in lieu of prerogative writs lie only in those cases where a remedy was available under a traditional prerogative writ. *See Central R. Co. of N.J. v. Department of Public Utilities,* 7 *N.J.* 247, 258 (1951); Jacobs, *supra, Rut.L.Rev.* (special number) at 34–35. Thus, in order for petitioner to establish that Art. VI, § V, par. 4 guarantees him a right of appeal from Committee determinations, he must prove that an appeal from such determinations would have been available under a traditional common law prerogative writ.

The only common law writ which could possibly have been utilized to appeal determinations by agencies such as the Committees would have been the writ of *certiorari.*[18] It has always been one of of the primary purposes of the writ of *certiorari* to give the courts the power to review the actions of legislatively created administrative agencies. *McKenna v. New Jersey Highway Auth.,* 19 *N.J.* 270, 274–75 (1955); *Trapahagen v. West Hoboken,* 39 *N.J.L.* 232, 236 (Sup.Ct.1877). *See also The Queen v. Sheffield Railway,* 11 *Adolphus & Ellis* 194 (Q.B.1839). Petitioner and the Association maintain that the writ of *certiorari* would also have provided a basis for review of determinations of judicially created agencies such as the Committees, and that therefore this review is now guaranteed as of right by *N.J. Const.* (1947), Art. VI, § V, par. 4.

The first weakness in petitioner's position is that there is no evidence that the writ of *certiorari* was ever used to review

---

[18]*Certiorari* was used by the pre-1947 Supreme Court to review the actions of inferior tribunals such as administrative agencies. *McKenna v. New Jersey Highway Auth.,* 19 *N.J.* 270, 274–75 (1955). The other prerogative writs, *mandamus, prohibition,* or *quo warranto,* were wholly inapplicable to reviewing agency determinations. *Mandamus* was a specific writ used for requiring government officials to carry out required ministerial duties. *Id.* at 275–76. *Quo warranto* was used only for challenging the right of an individual to hold a public office. *New Jersey State Lodge-Fraternal Order of Police v. Aaron,* 39 *N.J.Super.* 423, 427 (App.Div.1956). *Prohibition* was the traditional writ used to block proceedings where a tribunal was acting "manifestly beyond its jurisdiction." *Alexander v. Crollott,* 199 *U.S.* 580, 580, 26 *S.Ct.* 161, 161, 50 *L.Ed.* 317 (1905).

determinations of judicially created agencies such as the Committees. Under the 1947 Constitution this Court has established several agencies to oversee the Bar and administer the judicial system. Prior to 1947, however, the only "agencies" created by the courts were the Board of Bar Examiners and county committees established to review the "character and fitness" of bar applicants.[19] *See* 1938 Rules of the Supreme Court, Rule 2 and 10(e). We have been unable to find any case where *certiorari* was used to review determinations by the Board of Bar Examiners or by the county character committees,[20] and, for the reasons outlined below, conclude that the writ was not available for such review.

There are two explanations for the fact that *certiorari* was apparently never utilized to review actions of the pre-1947 judicial "agencies." For one thing, the Board of Bar Examiners and the county ethics committees were primarily advisory bodies which helped the Supreme Court screen bar applicants for the Governor's approval.[21] There was thus not the same need to provide *certiorari* review of their determinations as there was for administrative agencies such as the Workers' Compensation Board which actually made final adjudications of disputes. Also, and more importantly, *certiorari* review of judicial agencies was not called for because the basic purpose for constitutionally protected *certiorari* review was to make sure that the Legislature did not make unreviewable in the courts actions of

---

[19]The wide-ranging disciplinary functions which this Court now vests in the District Ethics Committees and the Disciplinary Review Board were, prior to 1947, vested in the Supreme Court and county ethics committees by the Legislature. *See* The Practice Acts, *N.J.S.A.* 2:20 thru 2:23 (repealed).

[20]Neither petitioner nor the Association cite any such cases. At oral argument, the Association stated that they could find no cases where a prerogative writ was used to review determinations of judicially created agencies.

[21]Under the Practice Acts, it was the Governor who actually licensed attorneys, upon the recommendation of the Supreme Court. *N.J.S.A.* 2:21 (repealed).

administrative agencies. *See Fischer v. Township of Bedminster*, 5 *N.J.* 534, 540 (1950) ("The inherent power of superintendence of inferior tribunals was secured to the Supreme Court by the Constitution of 1844; and it was not within the competency of the Legislature to impair the substance of *certiorari* as a prerogative writ within the exclusive domain of that court"); *Trapahagen v. Township of West Hoboken*, 39 *N.J.L.* 232, 235–36 (Sup.Ct.1877). Thus, we conclude that the pre-1947 writ of *certiorari* was not available for review of judicial—as opposed to ordinary administrative—agencies, and that therefore *N.J. Const.* (1947), Art. VI, § V, par. 4, does not mandate that an action in lieu of prerogative writs lie by right from the determinations of judicially created agencies such as the Committees.

 The second and more important weakness in petitioner's claim is that such a right of appeal would be inconsistent with our plenary authority to regulate the Bar granted by *N.J.Const.* (1947), Art. VI, § II, par. 3. Our Constitution provides that actions in lieu of prerogative writs must be brought in the Superior Court. If petitioner's interpretation is correct, then there would have to be appeals as of right to the Superior Court not only from the Committees but also from the other agencies created by this Court to regulate the Bar—such as the Disciplinary Review Board. Providing such appeals, however, would result in a reinstatement of the pre-1947 procedure for disciplining attorneys wherein the old Supreme Court heard appeals from county ethics committees established by the Legislature. One of the primary purposes of *N.J.Const.* (1947), Art. VI, § II, par. 3, was to take all of these matters away from the intermediate courts and vest exclusive authority over the regulation of the Bar in the State's highest court. *See State v. Rush*, 46 *N.J.* 399, 411 (1966). It is especially significant for our purposes here that a central element in this Court's constitutional authority over the Bar and the judicial system is our control over the procedures under which these institutions are regulated. *See, e. g., Toft v. Ketchum*, 18 *N.J.* 280, 284 (1955). An interpretation of the prerogative writ clause that would under-

mine this control is particularly inconsistent with the purposes of *N.J.Const.* (1947), Art. VI, § II, par. 3. The framers of the prerogative writ clause could not have intended that clause, whose primary purpose was to guarantee appeals as of right from legislatively created administrative agencies, Jacobs, *supra, Rut.L.Rev.* (special number) at 34, to have such an interpretation.[22] Thus, we hold that actions in lieu of prerogative writs were not intended to lie from agencies established by this Court pursuant to its Art. VI, § II, par. 3 power to regulate the Bar.

(b) *Division 540 v. Mercer County Improvement Auth.*

In *Division 540 v. Mercer County Improvement Auth.*, 76 *N.J.* 245 (1978), we held that judicial review is available from an arbitration under New Jersey's labor arbitration statute, *N.J. S.A.* 40:37A–96, even though the statute itself does not provide for such review. The Court, per Justice Sullivan, held:

> Although *N.J.S.A.* 40:37A–96 has no express requirement for judicial review of the arbitrator's award, we conclude that such review must be available if the statutory provision is to be sustained. The statute subjects the development Authority to compulsory and binding arbitration. Because it is compulsory, principles of fairness, perhaps even due process, require that judicial review be available to ensure that the award is not arbitrary or capricious and that the arbitrator has not abused the power and authority delegated to him. [*Id.* at 253].

The Association argues that the same "principles of fairness' require judicial review of compulsory arbitrations by the Committees. We disagree.

The holding of *Division 540* is inapplicable to arbitrations conducted pursuant to our constitutional authority to regulate the Bar.[23] The same rationale—that attorneys are subject to

---

[22]The inappropriateness of having Committee or Disciplinary Review Board decisions appealed to the Superior Court is further demonstrated by the fact that this Court has labeled these committees "agents" of the Supreme Court. *In re Logan*, 70 *N.J.* 222, 225 (1976). *See also Toft v. Ketchum*, 18 *N.J.* 280, 284 (1955).

[23]In *Kearny PBA Local # 21 v. Kearny*, 81 *N.J.* 208 (1979), Justice Pashman suggested that the holding of *Division 540* can be limited to the special kind of

extensive regulation by this court [24]—which justifies compulsory arbitration of their fee disputes also justifies eliminating appeals from such arbitration despite the general "principles of fairness" enunciated in *Division 540*. We restate that if appeals as of right from the Committees were taken to the Superior Court, as petitioner and the Association urge, such appeals would greatly undermine this Court's exclusive jurisdiction over the regulation of the Bar.

## III.

## POLICY JUSTIFICATIONS FOR THE PRESENT *R*.1:20A SCHEME

Petitioner and the Association isolate two aspects of the present *R*.1:20A arbitration scheme which they find particularly objectionable.[25] First, they maintain that the compulsory nature of this scheme for lawyers is both unnecessary and unwise. On this we wholly disagree. Second, they contend that even if a right to appeal from the Committees is not constitutionally mandated, some right to appeal should be provided as a matter of good public policy. Although we decline to permit any appeals from determinations by the Committees on the merits of particular cases, we do recognize the desirability of providing a limited right to appeal on procedural grounds.

---

"interest" arbitration involved in that case. *Id.* at 229 (Pashman, J., concurring). In *Division 540*, the arbitrators were empowered to create the terms of a labor contract. Justice Pashman would not extend the reach of *Division 540* to the more common "grievance" arbitrations, such as were involved in *Kearny* and in the instant case, where arbitrators are empowered to adjudicate only disputes between the parties before them. *Id.*

[24]*See* action IIB, *supra*.

[25]The claims at this point are addressed to the Court's power to change *R*.1:20A. They question the wisdom of the Rule, not its legality.

A. *The Compulsory Nature of R.1:20A*

The Association maintains that it is unnecessary for *R*.1:20A arbitration to be compulsory for attorneys because the courts, particularly the equity courts, provide clients with an adequate forum in which to settle their grievances over attorney fees. We disagree. We concur fully with the findings of a 1974 Report by the American Bar Association that forcing clients to go to court to resolve attorney fee disputes places a heavy burden on the clients. ABA, Report of the Special Committee on Resolution of Fee Disputes 2–4 (1974) ("Report"). Clients, especially those of limited income, often find it very difficult to procure another attorney to represent them in fee disputes. Also, if a client were forced to give the attorney a retainer that eventually proved to have been unreasonably high, the client might not be able to afford the delay of another trial before being reimbursed. As the ABA Report concluded, imposing these burdens on clients causes "immeasurable" harm to the relationship between the Bar and the public. *Id.* at 3.

The Association also contends that even if some form of arbitration is necessary for fee disputes, it need not be compulsory because attorneys will usually consent to participation in a fair arbitration process. The record wholly disproves this contention. According to the Report, national surveys demonstrate that a significant and growing number of attorneys refuse to arbitrate their fee disputes. *Id.* at 4. Some refuse because without arbitration the client is at a serious disadvantage. Referring to the problems mentioned above which clients face in fee disputes, the Report notes: "In view of these tremendous practical obstacles facing the dissatisfied client, it is hardly surprising that the less conscientious lawyer usually refuses to consent to binding arbitration. By the simple act of declining to submit to arbitration, this attorney can thwart the organized Bar's jurisdiction to consider the dispute and to implement a fair resolution." *Id.* at 2–3.

Finally, the Association contends that compulsory arbitration has disadvantages which outweigh any gains to be had from it in protecting clients. It relies upon the conclusion of the ABA Report that although some form of fee arbitration is desirable, compulsory arbitration is not a good idea. *Id.* at 4. We find the Report's reasons for rejecting compulsory arbitration unpersuasive.

The ABA Report cites two principal problems with a compulsory arbitration scheme: that it would be too controversial to ever be enacted, and that it would in essence be treating lawyers as "second class citizens." *Id.* The first problem is, of course, moot in New Jersey after our promulgation of *R.*1:20A. We see little merit in the ABA's second objection to compulsory arbitration. Lawyers have many rights and privileges as members of the New Jersey Bar and we find no difficulty in imposing a concomitant responsibility upon them to submit to arbitration of fee disputes when such arbitration is necessary to maintain public confidence in the Bar as a whole. Further, as discussed *infra*, we find the *R.*1:20A arbitration scheme to be fair to both clients and lawyers. We conclude, therefore, that the ABA Report's strong arguments for having attorney-client disputes arbitrated support the establishment of a compulsory arbitration scheme despite the ABA's own reservations about such a scheme.[26]

Our commitment to the Committees as presently constituted is buttressed by the fact that the agencies are effectively fulfilling their function. We note first that there is no evidence that the compulsory arbitration scheme in practice is causing

---

[26]As a substitute for compulsory arbitration, the ABA suggests a complex scheme in which an arbitration committee represents in court clients with legitimate claims against attorneys who refuse to submit to arbitration. Report at 4–6. Four states, Maine, Alaska, Massachusetts and California, have adopted arbitration schemes based on this ABA Model. Attorney General's brief at 6–8. We see no need to change to such a cumbersome technique in light of our findings that compulsory arbitration is necessary and our findings, *infra*, that the present scheme has been working well.

significant problems for lawyers.[27] Further, and more importantly, we find that the Committees have fairly and expeditiously adjudicated attorney-client fee disputes which would otherwise have either resulted in protracted litigation or in disgruntled clients giving up their claims.[28] Thus, we enthusiastically reaffirm our commitment to the compulsory arbitration scheme established by R.1:20A.

## B. Appeals from the Committees

Petitioner and the Association maintain that it is both unfair to lawyers and bad judicial policy for there to be no appeals permitted from Committee determinations. Some right to appeal, it is argued, is necessary in order to assure lawyers that compulsory arbitration under R.1:20A will always be fair. At least with regard to appeals from Committee determinations on the merits, we find petitioner's concerns far outweighed by the advantages of having fee disputes settled expeditiously and finally at the Committee level. We do, however, recognize the desirability of providing a limited right to appeal if certain fundamental procedural protections are not afforded by a Committee.

The wisdom of denying appeals on the merits from Committee decisions necessarily must depend on one's view of the importance of public confidence in the lawyer-client relationship. If it is true—and we believe it is—that public confidence in the judicial system is as important as the excellence of the system

---

[27]At oral argument, the Association conceded this point but maintained that it still objected to R.1:20A on "principle" because it infringes upon attorneys' constitutional rights.

[28]Since their inception in April 1978, approximately 1,500 requests for arbitration have been filed with the Committees. In only about a dozen of these cases has the Administrative Office of the Courts received any complaints about the Committees' operations. All the evidence suggests that the committees are performing a valuable service in expeditiously resolving fee disputes between attorneys and clients.

itself, and if it is also true—as we believe it is—that a substantial factor that erodes public confidence is fee disputes, then any equitable method of resolving those in a way that is clearly fair to the client should be adopted. The client's position in fee disputes is one of vulnerability from the beginning to the end: the lawyer has superior knowledge, usually superior bargaining power in arriving at the initial fee agreement, and, in any event, the ability to refuse the representation if not satisfied with its terms. If and when a dispute develops, a system that requires a client to hire another lawyer for trial and perhaps appeal on the fee dispute increases the client's initial vulnerability by significantly weakening his negotiating power to resolve the fee dispute. The client perceives, correctly, that the lawyer is part of the system, and when added to his dissatisfaction with his experience with that lawyer, the system offers him a remedy that, to him, promises not to solve his problem but only to compound it, dissatisfaction turns into despair and resentment. The least we owe to the public is a swift, fair and inexpensive method of resolving fee disputes. This may not end the dissatisfaction of some with the Bar and with the judicial system, but, at the very least, it will minimize the extent of such dissatisfaction. Further, it is important to assure the public that this Court, which has the ultimate power over the practice of law, will take an active role in making certain that clients are treated fairly in attorney-client disputes.

Besides helping to sustain public confidence in the Bar, the finality of Committee determinations also protects clients who can ill afford the time and expense of defending a Committee judgment on appeal. As we noted in section IIIA, *supra*, one of our primary concerns in promulgating *R*.1:20A was that clients should not be forced to incur such expenses in fee disputes.

Finally, we find unpersuasive the position of petitioner and the Association that the unappealability of Committee determinations is unfair to lawyers. If that is unfair, it is at least

equally unfair, for the client similarly has no appellate right. Further, when it is noted that Committee arbitration panels *must* consist of a majority of lawyers, it is difficult to see how such a system can be unfair to lawyers. Upon analysis, the claim that lawyers are treated as "second class citizens" is really not being seriously pursued, but rather the underlying claim is that lack of an appellate review renders the system less certain, in the aggregate, to yield just results. With that proposition taken in the abstract we have no argument, for appellate review is almost as essential a part of our notion of justice as is the trial itself. But just as in conventional arbitration proceedings, so here, appellate review may sometimes give way either in part or in whole to other social goals. It is our judgment that the advantages of swift, inexpensive proceedings outweigh by far any greater likelihood of just results achieved by allowing appellate proceedings. The loss of public confidence in the judicial system is too high a price to pay for some indeterminate improvement in the quality of fee arbitration determinations. We reaffirm, therefore, that appeals on the merits from Committee decisions will not be allowed.

 In barring appeals on the merits, however, we do recognize that both lawyers and clients may need a limited right of appeal in order to protect them from any egregious procedural deprivation before a Committee. We are, therefore, requesting the Civil Practice Committee, after soliciting the views of all interested parties, to recommend an amendment granting a limited right of appeal to the Disciplinary Review Board (DRB). That right should be limited to the following or similar grounds: that a Committee member failed to disqualify himself or herself in a case where he or she would appear evidently partial toward one of the parties; [29] that the Committee failed substantially to comply with the procedural requirements of *R.*1:20A, *e. g.*, by

---

[29]For a discussion of the problems which arise when Supreme Court Justices have to decide whether or not to recuse themselves, *see* "Recusal and Justice," 105 *N.J.L.J.* 476 (1980).

denying a party the right to subpoena witnesses; or that there was actual fraud on the part of one or more Committee members.

Such limited appellate right will not create the problems outlined above for the following reasons. First, the extremely small number of complaints that have been lodged about Committee proceedings in the past, *see* note 28, *supra*, indicates that the Committees are run fairly and that consequently procedural appeals will be very rare. Second, we fully expect the DRB to handle any such appeals which may arise under *R.*1:20A after it is amended with the understanding that speedy resolution of fee disputes is an important goal of our judicial system. Third, and most important, appeals of this kind to the DRB will ordinarily not require clients to find a new lawyer or incur any of the other expenses which would have to be incurred in court.

## IV.

## CONCLUSION

The ultimate wisdom of the fee arbitration system depends on its operation in fact. The overwhelming proportion of lawyers are able to maintain satisfactory relationships with clients concerning fees. Where the relationship disintegrates over fee disputes, many lawyers will take the loss rather than sue. Fee arbitration is for very few, it is used only in those few instances when either a lawyer is dissatisfied with the amount received and is willing to sue for satisfaction, or the client claims he is called upon to pay or has already paid too much and wants to reduce the lawyer's claim or get some money back. Though the matters which come to fee arbitration represent a very small proportion of the total number of fee relationships, they are among the most visible matters to a public greatly concerned about how the judicial system deals with attorney-client disputes. Our success in establishing a fair fee arbitration system will do much to assure the public of the fairness of the judicial system as a whole, and thereby increase the public confidence that is so necessary for that system to operate effectively.

Accordingly, we uphold the constitutionality and validity of
R.1:20A. We further direct that the question of amending
R.1:20A to provide a limited right of appeal in accordance with
this opinion be referred to this Court's Civil Practice Committee.

SCHREIBER, J., concurring.

I join in the opinion of the Chief Justice except with respect
to the stated policy generally limiting the scope of review of Fee
Arbitration Committees to disqualification of a Committee
member because of partiality, failure to comply with the proce-
dural requirements of R. 1:20A, e. g., by denying the issuance of
a subpoena compelling the attendance of witnesses or production
of documents at a party's request, or actual fraud on the part of
a Committee member.

My differences arise for two reasons. First, I believe that the
subject matter of this exception is such that the Court should
have the benefit of the thinking of the bar, the public and our
Civil Practice Committee before determining the appropriate
extent of review of decisions of Fee Arbitration Committees.
Second, it seems to me that review is more deservedly warrant-
ed in certain situations other than those predicated on some
"procedural grounds." *Ante* at 598. Thus, for example, if a
decision were wholly without evidentiary support, I would opt
for review of that decision, which as a matter of law could not
be sustained. In any event I am of the opinion that, after
benefiting from the input of the public and the bar, further
consideration should be given to the entire matter.

*For affirmance*—Chief Justice WILENTZ and Justices SUL-
LIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER
and POLLOCK—7.

*For reversal*—None.