Howard A. ANDERSON, Jr.

v.

Richard W. ELLIOTT.

Supreme Judicial Court of Maine.

Argued Nov. 2, 1988.

Decided March 8, 1989.

Ervin D. Snyder (orally), Wiscasset, for plaintiff.

J. Scott Davis, Board of Overseers of the Bar, Augusta, Amicus Curiae.

Richard W. Elliott (orally), Boothbay Harbor, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, CLIFFORD, HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

On this appeal by a practicing Maine lawyer, we reject his attack on the constitutionality of the requirement of the Maine Bar Rules that he submit to binding arbitration of a dispute with his client over the lawyer's fee.

The Supreme Judicial Court promulgated the Maine Bar Rules in 1978. Rule 9 establishes a mechanism for binding arbitration of attorney-client fee disputes under the jurisdiction of the Board of Overseers of the Bar, and Rule 3.3(c) obligates an attorney to submit any fee dispute to Rule 9 arbitration at the client's request. After ten years of operation, this client-initiated compulsory fee arbitration process now faces its first constitutional challenge. Boothbay Harbor attorney Richard Elliott, whose suit in the Superior Court to recover a fee from his client was dismissed as the result of a Rule 9 proceeding, argues that the Supreme Judicial Court in its rulemaking has infringed his right under the Maine Constitution to trial by jury "[i]n all civil suits ... except where it has heretofore been otherwise practiced." Me. Const. art. I, § 20.[1] We hold that the establishment of this fee dispute resolution process is within the Supreme Judicial Court's inherent power to regulate the bar, and we affirm the judgment of the Superior Court (Lincoln County; *Perkins, J.*) confirming an award by the Fee Arbitration Commission of the Board of Overseers in favor of Howard Anderson, the personal representative of Elliott's deceased client J. Russell Hornsby.

## I.

### The Fee Dispute

In the fall of 1983, Hornsby, himself a practicing lawyer in Orlando, Florida, retained Elliott on a contingent fee basis to represent him in a title dispute with a third party over land Hornsby owned in Boothbay Harbor. They executed a written fee agreement as required by Maine Bar Rule 8. The agreement limited Elliott's fee to one third of the "money damages recovery" and provided that:

> The client is not to be liable to pay compensation otherwise than from amounts collected for him by the attorney except as follows: None.

The title dispute was settled in the spring of 1984 with an exchange of deeds and the payment by the third party to Hornsby of $5,000 delivered to Elliott. Elliott kept the entire amount and billed Hornsby for an additional $9,101.51, on the ground that his efforts had enhanced the value of the property by $46,500. Hornsby died in July of 1986 with that fee dispute unresolved.

The following April, Elliott commenced a breach of contract action against Anderson, Hornsby's personal representative, in the Superior Court, and in July he filed a claim against the estate in the Lincoln County Probate Court. In September 1987 Anderson denied the claim against the estate and filed a petition for fee arbitration under Maine Bar Rule 9, asking that Elliott be ordered to refund $2,500 to the estate. Elliott's reply to the petition addressed only the merits of Anderson's claim. A Fee Arbitration Panel held a hearing on February 18, 1988, and the same day granted Anderson the relief he requested.[2]

---

**1.** Elliott also claims a right of jury trial under the Seventh Amendment, but the Supreme Court held in *Minneapolis & St. Louis R.R. v. Bombolis,* 241 U.S. 211, 217, 36 S.Ct. 595, 596, 60 L.Ed. 961 (1916), that "the Seventh Amendment applies only to proceedings in courts of the United States and does not in any manner whatever govern or regulate trials by jury in state courts." Unlike other preincorporation decisions, *Bombolis,* even though originally grounded in a general principle "[t]hat the first ten Amendments ... are not concerned with state action and deal only with Federal action," *id.,* has never been overruled. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2303 & n. 76 (1971 & Supp.1988).

**2.** Thus Elliott's objection under M.Bar R. 9(h)(3) that the award is untimely has no merit. Subsection 9(h)(3) requires only that the decision

In its decision, the Panel ruled first that Elliott's evidence of an increase in value from the exchange of deeds was "insufficient and incomplete," not only failing to substantiate his appraisal of the property received but also omitting altogether the value of the property conveyed. Second, by the terms of the agreement such an increase in value, even if proven, would be irrelevant. When the agreement was negotiated, Hornsby had expressly rejected Elliott's proposals for a retainer, saying that "we both deal with contingent fee agreements all the time. It is like shaking dice to see what we all get." The Panel

> conclude[d] that [Hornsby] and [Elliott], both being practicing lawyers, entered into a bargain for fees and that they are both bound by that bargain. In the absence of an agreement by Petitioner, we would feel obliged to order a refund of all monies in excess of $1,666.67 [one third of the $5,000 paid to Elliott].... [But, a]t the close of the hearing, Petitioner agreed that [$2,500] was all he was seeking. Consequently, we ... order that that sum be paid forthwith.

Only after learning of the Panel's adverse decision did Elliott first contest its authority to resolve the dispute. When Anderson filed a motion in the Superior Court for entry of judgment confirming the arbitration award pursuant to Maine Bar Rule 9(i) and 14 M.R.S.A. § 5937 (1980), Elliott moved under 14 M.R.S.A. § 5938 (1980) to vacate the award, contending that the Maine Declaration of Rights forbids any compulsory arbitration law that does not provide a right to review the arbitrator's award through a jury trial *de novo*.[3] The court granted Anderson's motion, entering judgment in his favor for $2,500 and dismissing Elliott's pending contract action.

We affirm the judgment of the Superior Court because Elliott failed to raise his constitutional objections in a timely manner. In his reply and thereafter before the Panel, Elliott participated fully in the resolution of the dispute on its merits. He never once registered with the Panel any objection or protest, nor did he take any steps to prosecute his already pending Superior Court suit for his fee or in any other way pursue collateral relief in the courts. Elliott's belated contention that he was unconstitutionally coerced into submitting to arbitration lacks an essential element—he has made no showing that he was coerced at all.

There is a strong public policy favoring arbitration. *Cf. J.M. Huber Corp. v. Main–Erbauer, Inc.,* 493 A.2d 1048, 1049–50 (Me.1985) (arbitration clause). The fee arbitration mechanism created by the Maine Bar Rules encourages the efficient resolution of sensitive monetary disputes between clients and their own attorneys. That desirable objective would be seriously frustrated if an attorney could wait to see if the panel rules in his favor before claim-

"be rendered promptly after the close of the hearing, and within 10 days thereof." Although the first copy sent was missing the signature page, a copy was forwarded to Elliott "as soon as reasonably possible after the [decision] has been filed," as required by M.Bar R. 9(h)(4).

**3.** Elliott's motion to vacate also introduced an argument that the Fee Arbitration Commission lacks jurisdiction over a fee dispute submitted by the personal representative of a deceased client. This contention is based on a misreading of Maine Bar Rule 9(g)(11), which provides as follows:

> In the event of the death or incompetency of a party to the arbitration proceeding prior to the close of the hearing, the proceeding shall abate without prejudice to either party to proceed in a court of proper jurisdiction to seek such relief as may be warranted. In the event of death or incompetency of a party

after the close of the hearing but prior to a decision, the decision rendered shall be binding upon the heirs, administrators or executors of the deceased and upon the estate or guardian of the incompetent.

Rule 9(g)(11) does not address the circumstances of the case at bar, where Hornsby's personal representative is the party in interest who has himself made the initial election to take *his* dispute with attorney Elliott to arbitration. The evident purpose of abatement upon the client's death during the pendency of the arbitration proceeding is to relieve the client's personal representative from the obligation of completing the fee arbitration after the loss of the principal witness; the personal representative may elect anew the forum for resolution of a fee dispute that the estate now has with the attorney. Abatement in the case at bar would not serve that purpose.

ing that the arbitration procedure is itself unconstitutional. *Cf. Monmouth School Comm. v. Huston,* 437 A.2d 621, 623 (Me. 1981) (party to arbitration may not wait until after decision to object to procedure); *McNeal v. Black,* 61 N.C.App. 305, 307, 300 S.E.2d 575, 577 (1983) (stockbroker's constitutional objection to arbitration under threat of professional sanctions untimely when first raised after client's motion to confirm: "If Black had prevailed at the arbitration hearing, it is clear that he would not be challenging the procedure at this time."). Even in the more compelling circumstance where the constitutional protection guaranteed a criminal defendant is at stake, the constitutional claim must as a rule be preserved at trial to be cognizable on appeal. *State v. Mann,* 361 A.2d 897, 904 (Me.1976).

■ By acquiescing in Anderson's choice of forum for the resolution of their dispute, and indeed by giving every sign of agreement that the Fee Arbitration Panel was the appropriate forum until his discovery that its decision was adverse to him, Elliott has failed to preserve any constitutional objection to the fee arbitration award against him. The constitutional question he has raised, however, is of continuing importance, and the issue has been fully briefed both by the parties and by the Bar Counsel as amicus curiae. Questions of great public interest that have not lost their controversial vitality may properly be addressed even though they have become technically moot in the case at bar. *State v. Gleason,* 404 A.2d 573, 578 (Me.1979); *King Resources Co. v. Environmental Improvement Comm'n,* 270 A.2d 863, 870 (Me.1970). The prudential considerations that preclude the premature resolution of constitutional questions are absent here, and there is no value in restraint. Indeed, the Supreme Judicial Court would be remiss in its supervisory responsibility over the bar if, sitting as the Law Court, it were to deliver an opinion implying that the constitutional objection to the Maine Bar Rules might be valid, though its resolution be

postponed because the claimant at bar had failed to preserve it.

## II.

### *Arbitration Under Maine Bar Rule 9*

Before discussing our grounds for upholding the procedure the Supreme Judicial Court has established for resolving fee disputes, we explain more fully the nature and history of Rule 9 arbitration. The predecessor to the present attorney fee arbitration system was a voluntary program begun by the Maine State Bar Association (MSBA) in the fall of 1975, at a time when the shortcomings of exclusive reliance on the courts had become apparent and many states were adopting voluntary or mandatory programs for alternative resolution of attorney-client fee disputes. The MSBA fee arbitration panels heard some fifteen to twenty cases during each year of the program's existence. The program was "very well received" by those who participated, *see* Report of the Standing Committee for the Resolution of Fee Disputes, 13 Me.Bar Bull. 156 (1979), but participation, as these figures show, was fairly limited.[4]

The shortcomings of voluntary arbitration were not unique to Maine. The American Bar Association (ABA) established a special committee to look into the problem; the committee observed that the vast majority of lawyers shared their clients' desire for a fair and effective procedure for resolving fee disputes, but the few "whose billing practices do not reflect a sense of professional responsibility" were precisely those most likely to become involved in fee disputes in the first place. The ABA's proposed solution was a system of compulsory but only partially binding arbitration under the auspices of a state bar association: an attorney need not consent to be bound by the arbitrator's award, but the bar association would provide free representation for the client in any legal proceedings to collect any portion of the disputed fee found excessive by the arbitra-

---

**4.** The number of fee arbitration hearings each year has now risen fairly steadily from about 30 in 1980 to almost 50 in 1987, and additional fee disputes are resolved less formally at earlier stages of Rule 9 proceedings.

tors. *See* ABA Section of Bar Activities, Report of the Special Committee on Resolution of Fee Disputes (1976).[5]

In Maine, the impetus for going beyond voluntary arbitration came from the proceedings during the mid–1970s that led to the promulgation of the Maine Bar Rules (including the first official Maine Code of Professional Responsibility) and the formation of the Board of Overseers of the Bar.[6] A major purpose of the new Board was to take jurisdiction over certain activities previously conducted by the Maine State Bar Association but deemed more appropriately exercised by an official body than by a voluntary association. In its order of May 11, 1978, creating the Board of Overseers, the Supreme Judicial Court declared one of the Overseers' responsibilities to be "[t]o establish and maintain an arrangement for arbitration of fee disputes which, when invoked by any client, will be compulsory upon the client's lawyer as a condition precedent to his right to engage in the practice of law in the State." 12 Me.Bar Bull. 112 (1978). This proposal did not generate the sort of controversy that surrounded a similar program for client-initiated compulsory fee arbitration introduced in New Jersey at about the same time. *See In re LiVolsi*, 85 N.J. 576, 582, 428 A.2d 1268, 1270–71 (1981).

The arrangement thereby established was promulgated as Maine Bar Rule 9, taking effect on November 1, 1978. In its current form, which is essentially identical to the original, Rule 9 provides for a Fee Arbitration Commission sitting in five panels of three corresponding to five geographic districts,[7] each panel with one lay member and two attorneys. M.Bar R. 9(a),

9(c). Proceedings may be initiated by "a complaint from any source[8] regarding legal fees paid to or charged by an attorney admitted to the Bar of this State," and the petitioner must agree to be bound by the Commission's decision. M.Bar R. 9(e)(1). A hearing is held only if efforts to resolve the dispute less formally fail and the petition withstands a preliminary screening by the Bar Counsel and the chair of the Commission. M.Bar R. 9(e)(1)–9(e)(3). If the dispute is not resolved within 30 days after the petition is filed, a copy of the petition is sent to the attorney along with "a copy of these procedures and any relevant rules and regulations" and a blank Respondent's Reply and Submission to Arbitration form. M.Bar R. 9(e)(4)(A). The attorney has 30 days to reply. M.Bar R. 9(f).

The chair of the panel must "make every effort" to schedule a hearing within 60 days of receiving the petition and any reply. Both parties are then sent notice of hearing, which includes the names and addresses of the arbitrators and advises the parties "of their right to present witnesses and documentary evidence in support of their positions, and at their own expense, to have a record of the proceedings made." M.Bar R. 9(e)(5). Each party has the right to hire an attorney at any stage, and the panel may at its discretion appoint a volunteer attorney to represent either party. M.Bar R. 9(e)(6). The chair of the panel "shall exercise all powers relating to the conduct of the hearing," and is not bound by the Maine Rules of Evidence. M.Bar R. 9(g)(6). The parties and the arbitrators may question any witness and may demand

---

5. This procedure was described as "cumbersome" in *In re LiVolsi*, 85 N.J. 576, 600 n. 26, 428 A.2d 1268, 1280 n. 26 (1981), and erroneously described as having been adopted in Maine.

6. The court received assistance from many sources in its task of soliciting input from the general public and the legal profession. In particular, the Select Commission on Professional Responsibility chaired by Colby College President Robert E.L. Strider, consisting of four lay members and eleven attorneys, was established by order of the Supreme Judicial Court to conduct hearings and to draft a proposed Maine

Code of Professional Responsibility. Me.Rptr., 381–384 A.2d LXIX–LXX (Jan. 17, 1978).

7. Originally there had been four panels, as under the former voluntary scheme, but the district encompassing both Cumberland and York Counties was split in 1988 because a substantial increase in the number of cases had resulted in a backlog.

8. The procedure established for processing the complaint does, however, anticipate that the petition will be filed by or on behalf of the client rather than the attorney.

that the witness testify under oath. M.Bar R. 9(g)(7)–9(g)(8).

On motion by the petitioner, all other judicial and administrative proceedings relating to the fee dispute shall be stayed pending the outcome of the arbitration "and the award hereunder shall be determinative of the action so stayed." M.Bar R. 9(e)(5)(D). The petitioner is responsible for notifying the Commission of all pending actions, and must certify that the matter has not yet been finally adjudicated by a court or administrative agency. M.Bar R. 9(e)(1)(D). If the attorney fails to make a timely reply or fails to appear at the hearing, the panel may proceed "and the attorney shall be bound by the findings and award of the panel in the same manner, and with the same effect, as a default judgment entered by the Superior Court." M.Bar R. 9(f); *see* M.R.Civ.P. 55.

The arbitration hearing is private and all documents except the award itself are confidential. M.Bar R. 9(j). That award must be rendered, in writing, within 10 days after the hearing unless the chair of the Commission extends the deadline, and must include "a statement of the amount or nature of the award, if any, and the terms of payment, if applicable." M.Bar R. 9(h)(1)–9(h)(3). It may include a signed dissent if the panel is divided. M.Bar R. 9(h)(1). The award becomes final as soon as it is signed and filed. M.Bar R. 9(h)(1). Copies must then be forwarded to the parties and their counsel "as soon as reasonably possible." M.Bar R. 9(h)(4).

The arbitration proceeding is governed by the Maine Uniform Arbitration Act, 14 M.R.S.A. §§ 5927, 5929–5949 (1980),[9] with all members of the panel assuming the rights and duties of neutral arbitrators under the Act. M.Bar R. 9(g)(3), 9(i). Under the Act either party may file a motion to confirm the award in a summary proceeding in the Superior Court. 14 M.R.S.A. §§ 5937, 5942. There is no provision for a trial *de novo*, by jury or otherwise. The opposing party may move to vacate the award, but judicial review of any kind is highly circumscribed: if the arbitrators have acted within their powers the court must enter judgment on the award unless there was fraud, corruption, partiality, or similar misconduct. *Id.* §§ 5937–5941. Either party may also move to modify or correct the award, but only to rectify a technical error or an "evident miscalculation" or misdescription. *Id.* § 5939.

### III.

#### *The Constitutionality of Rule 9 Arbitration*

Maine Bar Rule 9 enables a client to prevent his attorney from having their fee dispute heard by a jury, but that by itself does not violate the constitutional guarantee of the right to a civil jury trial, Me. Const. art I, § 20. Elliott's thesis that a suit to recover a contingent fee is just like any other suit for money damages for breach of contract—in other words, that the attorney-client relationship is just like any other contractual arrangement—ignores the uniqueness of the attorney's relation to the court and to the client.

The "judicial power of this State," Me. Const. art. VI, § 1, is itself of constitutional dimension, and is the exclusive province of the courts. Me. Const. art. III, § 2; art. VI, § 1. *See Board of Overseers of the Bar v. Lee,* 422 A.2d 998, 1001–02 & n. 10 (Me.1980), *appeal dismissed,* 450 U.S. 1036, 101 S.Ct. 1751, 68 L.Ed.2d 233 (1981). The Supreme Judicial Court, like other state high courts, holds "plenary, exclusive, and almost unchallenged power over the practice of law in all its aspects." *In re LiVolsi,* 85 N.J. at 585, 428 A.2d at 1272. The Supreme Judicial Court in its rulemaking capacity binds not only the bar and all other courts; these rules also have the full force of law in our deliberations as

---

9. The section of the Act not cited, 14 M.R.S.A. § 5928 (1980), governs motions to compel or stay arbitration and resolution of pending court actions in contractual arbitration proceedings. M.Bar R. 9(i) was amended in 1985 to include an express provision that section 5928 is inapplicable. Me.Rptr., 479–487 A.2d LXVII, LXXV, LXXXIV. *See also Nisbet v. Faunce,* 432 A.2d 779, 781–82 (Me.1981).

the Law Court.[10] *See State v. Doucette,* 544 A.2d 1290, 1294 & n. 3 (Me.1988) (Supreme Judicial Court sitting as Law Court lacks power to amend Maine Rules of Evidence to provide case-by-case exceptions to hearsay rule on the lines of F.R.Evid. 803(24), which has no Maine counterpart). Upon taking the ancient oath to "delay no man for lucre or malice, but ... conduct yourself in the office of an attorney ... with all good fidelity, as well as to the courts, as to your clients," 4 M.R.S.A. § 806 (1979),[11] the attorney enters into a regulated profession and becomes an officer of the court subject to the court's inherent power. *Board of Overseers of the Bar v. Lee,* 422 A.2d at 1002–03.

The judicial power encompasses all regulation of the legal profession necessary to the proper administration of justice. "Besides standards readily derived from the criminal law and from the general law pertaining to fiduciaries, certain standards peculiarly applicable to attorneys are derived from traditions of the bar designed to assure fairness and efficiency of court procedures and adjudications and to foster public confidence in such fairness and efficiency." *In re Dineen,* 380 A.2d 603, 604 (Me.1977). One of these traditions the Supreme Judicial Court has embodied in Maine Bar Rule 3.3(a), which begins:

A lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee. A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.

This obligation is no recent innovation. The tradition of service to the client has long been an aspiration of the legal profession; it has been one of the primary sources for the classical models of "professionalism" that emphasize the subordination of financial gain to an ideal of public service enforced by professional discipline. *See generally* American Association of Law Schools, *Selected Readings on the Legal Profession* 52, 63–76 (1962). Canon 13 of the former Canons of Ethics of the American Bar Association provided: "A contract for a contingent fee ... should always be subject to the supervision of a court, as to its reasonableness." [12] A century ago we remarked on the law's "great[ ] desire[ ] that the attorney should be satisfied with a reasonable compensation." *Burnham v. Heselton,* 82 Me. 495, 500, 20 A. 80, 81 (1890). And much earlier, the lawyer of the Massachusetts Bay Colony swore to "increase no fees but be Contented with such fees as are by order of

**10.** The dichotomy between the Supreme Judicial Court as rulemaker and the Supreme Judicial Court sitting as the Law Court does, however, place responsibility on both sides; the Law Court has the power and the duty to invalidate any rule of court repugnant to the Constitution or to a controlling statute. *See State v. Kelly,* 376 A.2d 840, 844 (Me.1977).

**11.** The language of this oath follows, with only a few stylistic changes, the text of a colonial statute in 1701 that has been in force continuously since that date in Maine and in Massachusetts. A version of that oath was administered to the attorneys admitted to the bar when common law courts were first established in Massachusetts in 1686. The text has been traced to lawyers' oaths published in England at about that time and dating back to the thirteenth century. *See generally* Neal W. Allen, *The Maine Attorney's Oath of 1686* (unpublished address to newly admitted members of the Maine bar, Oct. 1, 1986).

**12.** This supervision has been exceptionally strict in Maine. Since statehood, champerty has been prohibited by statute, *see* P.L. 1821, ch. 20, and

contingent fee arrangements were considered champertous. *See Hinckley v. Giberson,* 129 Me. 308, 151 A. 542 (1930). Only in 1965, by which time contingent fees were permitted in the other 49 states, did the legislature finally amend the champerty statute to exempt contingent fee agreements in civil actions. P.L.1965, ch. 333, *now codified at* 17–A M.R.S.A. § 516(2) (1983). The Supreme Judicial court immediately promulgated M.R.Civ.P. 88, requiring that contingent fee agreements be *in writing, regulating the form and substance of such agreements,* and providing for judicial review before a single justice of the Supreme Judicial Court or of the Superior Court to determine the reasonableness of the agreement. *See generally* Field, McKusick & Wroth, *Maine Civil Practice* § 88.1 (2d ed. 1970). Maine Bar Rule 8, which superseded Civil Rule 88, follows its predecessor almost verbatim except that M.R.Civ.P. 88(f), which provided for review in a nonjury court proceeding, has been replaced by Maine Bar Rule 8(f), which provides for "review in accordance with Rule 9."

Councill or the Judge of this Court allowed." Josiah H. Benton, *The Lawyer's Official Oath and Office* 59 (1909).

Thus attorney fees, like all other aspects of the practice of law, have always been the subject of court regulation; for the sound administration of justice that regulation needs to include an effective procedure for enforcement of the attorney's professional duty to charge only a reasonable fee. The court's regulation of the attorney-client relationship, however, must be more than a disciplinary mechanism. The possibility of ethical violations by lawyers in charging for their services is not the only basis, or numerically the most significant basis, for the need for an effective method of resolving fee disputes. Legitimate disagreements over fees can and do arise between clients and their attorneys, in the same way that they can and do arise between other contracting parties. *See, e.g., Shapiro v. Drummond, Woodsum, Plimpton & MacMahon, P.A.*, 551 A.2d 863 (Me. 1988). But an attorney-client fee dispute is no ordinary contractual controversy. Members of the public as a practical matter have access to the courts only through their attorneys, and that access is impaired by collateral controversies over legal charges. Furthermore, in the view of many observers, attorney fee disputes are the principal source of public dissatisfaction with the judicial system. *See, e.g.,* ABA Section of Bar Activities, Report of the Special Committee on Resolution of Fee Disputes, at 1; *In re LiVolsi*, 85 N.J. at 585, 428 A.2d at 1273. Practicing lawyers have few more difficult tasks than billing their clients, and at the same time clients often misunderstand the basis of their attorneys' bills.

In these circumstances it is advantageous to both lawyers and clients to have available a simple, speedy, and reliable system for resolving fee questions. In particular, the system must be one that can be used effectively by clients whose experience with the legal system is likely to be limited and bewildering, and who in disputes with their own attorneys go into court on an unequal footing. In light of that need, the Supreme Judicial Court's requirement that an attorney be prepared to submit to a less formal nonjury adjudication of fee disputes is an entirely reasonable exercise of the judicial power to superintend the bar.

Rule 9 is a narrowly tailored response to a problem that arises not infrequently in the attorney-client relationship. Rule 9 replaces, at the client's request, any trial in court with a method of dispute resolution that accords full due process to the attorney, including the judicial safeguards of the Uniform Arbitration Act. Furthermore, the entire fee arbitration system operates under the direction of a creature of the court, the Board of Overseers of the Bar. The lawyer appealing in the case at bar makes no argument, and could make no argument, that fee arbitration is likely to produce any less reliable, or any less fair, determination than a jury trial. In these circumstances, the court's action in providing the client a faster and procedurally less forbidding forum for fee disputes, while at the same time assuring the attorney a fair and reasonable determination, comes within the court's constitutional authority to regulate the attorney-client relationship. As such, it does not improperly infringe any constitutional jury right. Nothing more is required for the Maine fee arbitration system to pass constitutional muster.

Our decision today is in accord with those in the only other state that has encountered a similar constitutional challenge to attorney fee arbitration. Both state and federal courts have upheld the New Jersey Supreme Court's inherent power to impose a client-initiated fee arbitration program by rule of court adopted at about the same time as the Maine plan. *See In re LiVolsi*, 85 N.J. 576, 428 A.2d 1268 (1981); [13] *Kelley*

---

13. As an alternative ground for its decision, the New Jersey Supreme Court relied upon a line of New Jersey cases establishing that a client disputing an attorney fee had a suit in equity to determine the reasonable level of compensation and to enjoin an action at law by an attorney seeking to collect an excessive fee. *See In re LiVolsi*, 85 N.J. at 587–90, 428 A.2d at 1273–75. Thus an attorney in New Jersey had no *a priori*

*Drye & Warren v. Murray Indus., Inc.,* 623 F.Supp. 522 (D.N.J.1985). *See* Annotation, *Validity of Statute or Rule Providing for Arbitration of Fee Disputes Between Attorneys and Their Clients,* 17 A.L.R.4th 993 (1982). In *Kelley Drye,* a New York firm practicing in New Jersey had argued that *LiVolsi* was not binding on nonresidents whose jury right was guaranteed by the Seventh Amendment rather than by the New Jersey Constitution, but the court replied:

> [T]he State may impose reasonable conditions and limitations upon those who wish to exercise th[e] privilege [of practicing law]. Here the Court Rules are reasonable and [the plaintiff law firm] has opted to be bound by them. No Seventh Amendment rights are implicated.

623 F.Supp. at 527.

The attorney stands in a relationship of trust and confidence, both to the client and to the court. The overriding responsibility and authority of the Supreme Judicial Court to superintend that professional relationship is a complete answer to the constitutional challenge to Maine's client-initiated fee arbitration. Nothing in the jury trial provision of the Maine Constitution stands in the way of this simplified, expeditious, and fair way of resolving fee disputes between attorney and client.

The entry is:

Judgment affirmed.

All concurring.

right to have a fee dispute decided by a jury even in the absence of compulsory arbitration.

Maine too has always recognized that lawyers stand in a fiduciary relationship to their clients. *See In re Dineen,* 380 A.2d 603 (Me.1977); *Burnham v. Heselton,* 82 Me. 495, 500, 20 A. 80, 81 (1890); *Dunn v. Record,* 63 Me. 17, 19 (1874). But, for the purposes of this case, we have no need of deciding whether in Maine the equity powers of the Maine Superior Court are as extensive as were those of the New Jersey Court of Chancery.