**A. FRED MILLER, ATTORNEYS AT LAW, P.C., Appellant,**

v.

**Mary Jane PURVIS, Appellee.**

No. S–6679.

Supreme Court of Alaska.

July 26, 1996.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*OPINION*

MATTHEWS, Justice.

A. Fred Miller, a professional corporation (Miller), represented Mary Jane Purvis in a divorce case and charged her $34,914.50 in fees, $1,017.61 for expenses, $4,596.97 in interest, and $1,624.97 in sales tax. Purvis invoked the mandatory fee arbitration provisions of Alaska Bar Rules 34–42. Prior to the hearing, Purvis had paid Miller $17,017.01 and Miller had reduced its fee by $6,200; Miller claimed that Purvis still owed $24,924.64. The arbitration panel concluded that "a reasonable fee payment would have been $8,500 and that [Miller] should be required to repay [Purvis] the amount of $8,500."

Miller filed a petition in the superior court to vacate the panel's award. After briefing by the parties and the Alaska Bar Association, the superior court denied Miller's petition, and entered judgment on the award which, with interest, costs and attorney's fees, totaled $9,887.00.

Miller appeals from this judgment, contending that the limits which Alaska Bar Rule 40(u) imposes on appeals from fee arbitration panels constitute a denial of due process. We affirm for the reasons stated below.

Mandatory attorney fee arbitration has been a feature of the Alaska legal landscape since 1974. Supreme Court Order # 176 (February 26, 1974). The rules were proposed by a committee of the Alaska Bar Association and approved by the members of the bar acting in convention and through the Board of Governors with a request that this court adopt them.[1] Under the fee arbitra-

Kevin Morley, A. Fred Miller, P.C., Ketchikan, for Appellant.

Ronald P. Hemby, Law Office of Ronald P. Hemby, Ketchikan, for Appellee.

---

1. Resolution No. 3 of the Alaska Bar Association acting in convention on June 16, 1973, provides:

 WHEREAS, the Alaska Bar Association presently has no mechanism for determining fee disputes between attorneys and their clients;

 WHEREAS, the Alaska Bar Association has a responsibility to the public to provide a means for the arbitration of fee disputes without the time and expense of litigation in the court system;

 WHEREAS, attorneys desire to avoid litigation with clients over fees; and

 WHEREAS, a rule providing for mandatory arbitration of fee disputes would be of mutual benefit to both attorneys and clients for a prompt resolution of such differences.

 THEREFORE BE IT RESOLVED that the Alaska Bar Association hereby recommends that the presently proposed attorney fee review committee rules be approved by the Bar Association and forwarded to the Supreme Court

tion rules,[2] a client having a fee dispute with an attorney has a right to have the dispute resolved by arbitration. Alaska Bar Rule 34(b). An attorney does not have a reciprocal right. The arbitrators are standing members of "area fee dispute resolution divisions." Alaska Bar Rule 37(a). If the dispute is in excess of $2,000 it will be decided by an arbitration panel consisting of not less than two attorney members and one public member of the area division. Alaska Bar Rule 37(c). The members are subject to peremptory challenge, Rule 37(h), challenges for cause, Rule 37(g), and must be disinterested, Rule 37(f). The parties are entitled to be represented by counsel though they need not be so represented. Rule 40(f)(1). They have a right to present and examine witnesses and documentary evidence and to cross-examine opposing witnesses. Rule 40(f)(2), (3). Compulsory process to compel the attendance of witnesses and prehearing discovery is available. Rule 40(f)(8), (9). The parties may have the hearing recorded on tape. Rule 40(f)(11). Telephonic evidence may be presented, as may evidence in affidavit form. Rule 40(j), (k). The arbitration hearing need not be conducted according to technical rules of evidence; any relevant evidence will be admitted. Rule 40(n). The proceedings are confidential. Rule 40(r). The arbitration panel is to make its award in writing and the award is to be accompanied by findings on essential questions. Rule 40(q).

Rule 40(u) provides that either party may appeal the decision of an arbitration panel to the superior court on the grounds specified in Alaska's Uniform Arbitration Act, AS 09.43.120–.180. Under this act a reviewing court has limited authority to vacate an award. Grounds for vacating an award are, so far as relevant to fee dispute arbitration,

(1) the award was procured by fraud or other undue means;

(2) there was evident partiality by an arbitrator appointed as a neutral or cor-

ruption in any of the arbitrators or misconduct prejudicing the rights of a party;

(3) the arbitrators exceeded their powers; [or]

(4) the arbitrators refused to postpone the hearing upon sufficient cause being shown for postponement or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of AS 09.43.050, as to prejudice substantially the rights of a party[.]

AS 09.43.120(a)(1)-(4). In addition, the reviewing court is authorized to modify or correct an arbitration panel's award on the following grounds:

(1) there was an evident miscalculation of figures or an evident mistake in the description of a person, thing or property referred to in the award;

(2) the arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

(3) the award is imperfect in a matter of form not affecting the merits of the controversy.

AS 09.43.130(a)(1)-(3).

Summarized, Miller's argument is as follows. Fee arbitrations are mandatory for attorneys. Mandatory arbitration is constitutional only when there is judicial review on the merits, that is, awards should be reviewable for clearly erroneous findings of fact and arbitrary and capricious application of the law. Since fee arbitration is not reviewable on the merits it is unconstitutional.

In response, Purvis does not take issue with Miller's premise that mandatory arbitration generally should be accompanied by a right to appellate review on the merits. Instead, Purvis contends that the court's power and duty to regulate the legal profession and the attorney/client relationship justifies an attenuated standard of review.

with the recommendation that the Court adopt these rules.

APPROVED by the Anchorage Bar Association on June 11, 1973.

Done at Fairbanks, Alaska, this 16th day of June, 1973.

2. All citations are to the current Alaska Bar Rules.

In support of the general proposition that mandatory arbitration is unconstitutional in the absence of judicial review for factual and legal errors, Miller relies primarily on *Bayscene Resident Negotiators v. Bayscene Mobilehome Park*, 15 Cal.App.4th 119, 18 Cal.Rptr.2d 626 (1993). In that case the California Court of Appeal struck down on due process grounds a city ordinance which required binding arbitration for mobilehome park rent disputes. The court stressed that the primary failing of the ordinance was that it failed to provide for judicial review of the evidence; instead, the issues on appeal were "essentially limited to fraud, corruption, or other misconduct of a party or the arbitrator." *Id.* 18 Cal.Rptr.2d at 636. The court reviewed the law applicable to mandatory arbitration as follows:

> The California cases are consistent with federal law and law from other states. The United States Supreme Court, in a trilogy of cases in the 1920's, addressed the validity of a Kansas industrial relations act requiring compulsory arbitration of certain industrial disputes. (*Chas. Wolff Packing Co. v. Court of Industrial Relations* (1923) 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103 (*Wolff I* ); *Dorchy v. State of Kansas* (1924) 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686; *Chas. Wolff Packing Co. v. Court of Industrial Relations* (1925) 267 U.S. 552, 45 S.Ct. 441, 69 L.Ed. 785 (*Wolff II* ).) The Court found the act's scheme of compulsory arbitration deprived business owners of their property and liberty of contract without due process of law in violation of the Fourteenth Amendment. (*Wolff I*, 262 U.S. at p. 544, 43 S.Ct. at p. 636 [as the act applied to fixing wages]; *Wolff II*, 267 U.S. at pp. 560, 569, 45 S.Ct. at pp. 442, 445 [as the act applied to fixing hours of labor].) In *Nebbia v. People of State of New York* (1934) 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, the court later held price control regulations were unconstitutional "only if arbitrary, discriminatory, or demonstratively irrelevant." (*Id.* at p. 539, 54 S.Ct. at p. 517). The court has upheld compulsory binding arbitration schemes against due process challenge where the legislative choice is not unreasonable or arbitrary and the procedure adopted satisfies constitutional requirements of notice and an opportunity to be heard. (*Hardware Dealers' Mut. Fire Ins. Co. v. Glidden Co.* (1931) 284 U.S. 151, 158 52 S.Ct. 69, 70, 76 L.Ed. 214 [fire insurance policies required to provide for compulsory binding arbitration of the amount of loss].)

> Compulsory, binding arbitration still remains limited in large measure to situations in which the parties have agreed to arbitration as an alternative form of dispute resolution; however a growing number of statutory schemes whereby either one or both parties are compelled to submit to binding arbitration do exist. Statutory schemes requiring binding arbitration are normally found valid in limited contexts including resolving disputes in contracts with government agencies (*see, e.g., Hjelle v. Sornsin Construction Company* (N.D.1969) 173 N.W.2d 431), resolving labor disputes with public employees such as police and fire fighters (*see, e.g., Buffalo v. New York State Public Employment Relations Board* (1975) 80 Misc.2d 741, 363 N.Y.S.2d 896, *affd.* (N.Y.Ct.App.1975) 37 N.Y.2d 19, 371 N.Y.S.2d 404, 407, 332 N.E.2d 290, 293) and where the rights to be arbitrated have been created by federal statute (*see, e.g., Thomas v. Union Carbide Agr. Products Co.* (1985) 473 U.S. 568 593–594, 105 S.Ct. 3325, 3339–40, 87 L.Ed.2d 409, *see generally* Allison, *The Context, Properties, and Constitutionality of Nonconsensual Arbitration: A Study of Four Systems*, J. of Dispute Resolution (Vol. 1990) No. 1, 1.)

> Statutory schemes requiring binding arbitration have also been found valid when applied to highly regulated industries such as insurance or licensed professionals such as attorneys. (*See, e.g., Hardware Dealers' Mut. Fire Ins. Co. v. Glidden Co., supra*, 284 U.S. 151, 52 S.Ct. 69 [76 L.Ed. 214 (1931)] [binding arbitration clause to determine amount of loss required in every fire insurance policy]; *Guralnick v. Supreme Court of New Jersey* (D.C.N.J.1990) 747 F.Supp. 1109, *affd.* (3d Cir.1992) 961 F.2d 209 [compulsory binding arbitration of attorney/ client fee disputes].) While

states have broad power to regulate housing conditions and landlord-tenant relations (*see Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868; *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 130 Cal.Rptr. 465, 550 P.2d 1001), our research has not found rent disputes typically to be an area subject to compulsory binding arbitration.

Even in areas where statutory schemes requiring compulsory arbitration have been upheld, constitutionality often depends upon whether meaningful judicial review of the arbitrator's decision is provided. (*See Peick v. Pension Ben. Guar. Corp.* (7th Cir.1983) 724 F.2d 1247, 1277 [compulsory arbitration constitutional where it is "merely the first step" in dispute resolution with subsequent court review]; *Mount St. Mary's Hospital v. Catherwood* (N.Y.Ct.App.1970) 26 N.Y.2d 493, 311 N.Y.S.2d 863, 260 N.E.2d 508 [for compulsory arbitration due process requires judicial review of whether the award was supported by the evidence in record].)

*Id.* 18 Cal.Rptr.2d at 634–35 (alterations in original).

In addition Miller relies on a dictum in *State v. Public Safety Employees Ass'n,* 798 P.2d 1281, 1287 (Alaska 1990), where we indicated in the context of compulsory "interest" arbitration that a heightened standard of judicial review might be constitutionally required:[3]

When parties agree to submit their differences to an arbitrator, they should be bound by his decision. Courts should be reluctant to upset arbitrators' awards, lest the advantages of arbitration as a fast and certain means of resolving disputes be lost. Occasional uncorrected errors in arbitrators' decisions are tolerable because the parties have agreed to accept reduced possibilities of appellate review in order to have their dispute resolved quickly and with certainty. Compulsory arbitration is different. The parties have not agreed voluntarily to accept reduced possibilities of appellate review in order to resolve

their dispute swiftly. It is by operation of law that the parties are denied their usual right to have their disputes resolved by the courts. Therefore, a standard of review higher than gross error is appropriate.

Many states provide such a heightened standard of review by statute; Alaska does not. Other states have adopted a heightened standard of review as a matter of constitutional or common law. The New York Court of Appeals has held that due process requires that awards in private sector compulsory arbitration "be judicially reviewable for errors of law, competency and substantiality of evidence, as well as arbitrary and capricious conduct." *Mount St. Mary's Hosp. v. Catherwood,* 26 N.Y.2d 493, 311 N.Y.S.2d 863, 870, 260 N.E.2d 508, 513 (1970). It thus held that contractual provisions imposed in compulsory interest arbitration should be reviewed under the arbitrary and capricious standard and awards in compulsory grievance arbitration should be reviewed under the substantial evidence standard. *Id.* Noting that compulsory interest arbitration is a quasi-legislative function, the Rhode Island Supreme Court has also held that courts should review compulsory interest arbitration awards to determine whether an arbitrator's decision was arbitrary. *City of Warwick v. Warwick Regular Firemen's Assoc.,* 106 R.I. 109, 256 A.2d 206, 211 (1969).

We believe it appropriate to apply the arbitrary and capricious standard when reviewing awards in compulsory interest arbitrations. Without deciding whether such a standard is constitutionally required, a question the parties have not briefed, we will henceforth apply it as a matter of common law.

*Id.* at 1287–88.

In support of her contention that the court's power and duty to regulate the legal profession and the attorney/client relationship justify limited judicial review, Purvis relies primarily on cases from New Jersey and Maine, states which have mandatory at-

---

**3.** Interest arbitration is a type of arbitration where the arbitrator establishes new contract terms rather than deciding how disputes arising under existing contracts should be resolved.

torney's fee arbitration systems similar to Alaska.

The leading New Jersey case is *In re LiVolsi*, 85 N.J. 576, 428 A.2d 1268 (1981). The New Jersey fee arbitration system challenged in *LiVolsi* provided for no right to appeal the decisions of arbitration committees. An aggrieved lawyer, joined by the New Jersey state bar association as amicus, unsuccessfully raised a variety of constitutional challenges to the fee arbitration system, including violation of federal and state due process because of the unappealability of arbitration committee determinations. *Id.* 428 A.2d at 1270. Although the court addressed each claim separately, it began with a statement of its authority to promulgate the rule which was applicable to all claims:

> There is something almost anachronistic about the challenge to the Court's power to adopt R.1:20A under the New Jersey Constitution. For 33 years this Court has exercised plenary, exclusive, and almost unchallenged power over the practice of law in all of its aspects under *N.J. Const.* (1947), Art. VI, § II, par. 3. The enormous scope of this power puts R.1:20A in proper perspective. Though critically important, it is but a minor regulation of the practice of law compared to others whose validity is beyond dispute.
>
> The heart of the constitutional provisions concerning the judicial system was the concentration of responsibility for its proper functioning in the Supreme Court and Chief Justice. Such responsibility requires appropriate power over courts, judges, practice and procedure, and lawyers. Responsibility for an adversarial judicial system requires responsibility for the adversaries, and control over both.
>
> In exercising this responsibility, one of the many goals this Court has sought to achieve has been maintaining public confidence in the judicial system. The intended direct beneficiary of that system is the litigant, the client, who can realistically gain access to it only through his relationship with a lawyer. The value of the judicial product depends upon the effectiveness of this access, the effectiveness of this relationship. If lawyers refuse to repre-
>
> sent, the judicial system is almost worthless; if the terms and conditions of representation are unfair, the judicial system is impaired to that extent. This dependency of the public's confidence in the judicial system on its satisfaction with lawyer-client relationships is not theoretical: those dissatisfied with the system include a fair proportion dissatisfied with their lawyers. The most common cause of that dissatisfaction concerns fees, *see* section IIIA, *infra.*
>
> Given the critical importance of the constitutional power of this Court over the practice of law, and its pervasiveness, starting with admission, ending with disbarment, and covering everything in between, we have no doubt that the power extends to every aspect of fee agreements between lawyers and clients. If this Court can set a limit on fees for certain matters, *American Trial Lawyers v. New Jersey Supreme Court*, 66 N.J. 258, 330 A.2d 350 (1974) (upholding the contingent fee schedule promulgated in R.1:21–7); require service for no fee at all in others, *State v. Rush, supra*, 46 N.J. at 411–12, 217 A.2d 441 (noting this Court's authority to require attorneys to defend indigents without charge); and disregard completely fee agreements in all matters (if they are unreasonable), *Steiner v. Stein*, 2 N.J. 367, 372, 66 A.2d 719 (1949) (*see* section IIC, *infra* ); if, in short, this Court has the authority to control the substance of the fee relationship, then a power of a lesser magnitude—determining the procedure for resolving fee disputes—must also be within our province.

*LiVolsi*, 428 A.2d at 1272–73.

The court went on to note that under the due process clause of the Fourteenth Amendment to the United States Constitution states are not required to provide litigants with a right to appeal. *Id.* at 1276. Concerning the state due process argument, the court adverted to an interest arbitration case, *Division 540 v. Mercer County Improvement Authority*, 76 N.J. 245, 386 A.2d 1290 (1978), where the court had stated, "Because it is compulsory, principles of fairness, perhaps even due process, require that judicial review

be available to ensure that the award is not arbitrary or capricious and that the arbitrator has not abused the power and authority delegated to him." *LiVolsi*, 428 A.2d at 1279. The court held that this statement was not applicable to attorney fee arbitration:

> The holding of *Division 540* is inapplicable to arbitrations conducted pursuant to our constitutional authority to regulate the Bar. The same rationale—that attorneys are subject to extensive regulation by this court—which justifies compulsory arbitration of their fee disputes also justifies eliminating appeals from such arbitration despite the general "principles of fairness" enunciated in *Division 540*.

*Id.*

The *LiVolsi* court went on to state the general policy justification for mandatory attorney fee arbitration:

> We concur fully with the findings of a 1974 Report by the American Bar Association that forcing clients to go to court to resolve attorney fee disputes places a heavy burden on the clients. ABA, Report of the Special Committee on Resolution of Fee Disputes 2–4 (1974) ("Report"). Clients, especially those of limited income, often find it very difficult to procure another attorney to represent them in fee disputes. Also, if a client were forced to give the attorney a retainer that eventually proved to have been unreasonably high, the client might not be able to afford the delay of another trial before being reimbursed. As the ABA Report concluded, imposing these burdens on clients causes "immeasurable" harm to the relationship between the Bar and the public.

*Id.* 428 A.2d at 1279–80. Finally, the court specifically addressed the policy behind denying appeals on the merits:

> The wisdom of denying appeals on the merits from Committee decisions necessarily must depend on one's view of the importance of public confidence in the lawyer-client relationship. If it is true—and we believe it is—that public confidence in the judicial system is as important as the excellence of the system itself, and if it is also true—as we believe it is—that a sub-

stantial factor that erodes public confidence is fee disputes, then any equitable method of resolving those in a way that is clearly fair to the client should be adopted. The client's position in fee disputes is one of vulnerability from the beginning to the end: the lawyer has superior knowledge, usually superior bargaining power in arriving at the initial fee agreement, and, in any event, the ability to refuse the representation if not satisfied with its terms. If and when a dispute develops, a system that requires a client to hire another lawyer for trial and perhaps appeal on the fee dispute increases the client's initial vulnerability by significantly weakening his negotiating power to resolve the fee dispute. The client perceives, correctly, that the lawyer is part of the system, and when added to his dissatisfaction with his experience with that lawyer, the system offers him a remedy that, to him, promises not to solve his problem but only to compound it, dissatisfaction turns into despair and resentment. The least we owe to the public is a swift, fair and inexpensive method of resolving fee disputes. This may not end the dissatisfaction of some with the Bar and with the judicial system, but, at the very least, it will minimize the extent of such dissatisfaction. Further, it is important to assure the public that this Court, which has the ultimate power over the practice of law, will take an active role in making certain that clients are treated fairly in attorney-client disputes.

Besides helping to sustain public confidence in the Bar, the finality of Committee determinations also protects clients who can ill afford the time and expense of defending a Committee judgment on appeal. As we noted in section IIIA, *supra*, one of our primary concerns in promulgating R.1:20A was that clients should not be forced to incur such expenses in fee disputes.

Finally, we find unpersuasive the position of petitioner and the Association that the unappealability of Committee determinations is unfair to lawyers. If that is unfair, it is at least equally unfair, for the client similarly has no appellate right.

Further, when it is noted that Committee arbitration panels *must* consist of a majority of lawyers, it is difficult to see how such a system can be unfair to lawyers. Upon analysis, the claim that lawyers are treated as "second class citizens" is really not being seriously pursued, but rather the underlying claim is that lack of an appellate review renders the system less certain, in the aggregate, to yield just results. With that proposition taken in the abstract we have no argument, for appellate review is almost as essential a part of our notion of justice as is the trial itself. But just as in conventional arbitration proceedings, so here, appellate review may sometimes give way either in part or in whole to other social goals. It is our judgment that the advantages of swift, inexpensive proceedings outweigh by far any greater likelihood of just results achieved by allowing appellate proceedings. The loss of public confidence in the judicial system is too high a price to pay for some indeterminate improvement in the quality of fee arbitration determinations. We reaffirm, therefore, that appeals on the merits from Committee decisions will not be allowed.

*Id.* at 1281–82.

The Maine case relied on by Purvis is *Anderson v. Elliott,* 555 A.2d 1042(Me.), *cert. denied,* 493 U.S. 978, 110 S.Ct. 504, 107 L.Ed.2d 507 (1989). The challenge in *Anderson* was that the fee arbitration system was unconstitutional under the Maine constitution as a "compulsory arbitration law that does not provide a right to review the arbitrator's award through a jury trial *de novo.*" *Id.* at 1044. The Supreme Judicial Court of Maine upheld the rule based on the court's power to regulate the bar; it expressed the need for the rule as follows:

> [A]n attorney-client fee dispute is no ordinary contractual controversy. Members of the public as a practical matter have access to the courts only through their attorneys, and that access is impaired by collateral controversies over legal charges. Furthermore, in the view of many observers, attorney fee disputes are the principal source of public dissatisfaction with the judicial sys-

tem.... Practicing lawyers have few more difficult tasks than billing their clients, and at the same time clients often misunderstand the basis of their attorneys' bills.

> In these circumstances it is advantageous to both lawyers and clients to have available a simple, speedy, and reliable system for resolving fee questions. In particular, the system must be one that can be used effectively by clients whose experience with the legal system is likely to be limited and bewildering, and who in disputes with their own attorneys go into court on an unequal footing. In light of that need, the Supreme Judicial Court's requirement that an attorney be prepared to submit to a less formal nonjury adjudication of fee disputes is an entirely reasonable exercise of the judicial power to superintend the bar.

> Rule 9 is a narrowly tailored response to a problem that arises not infrequently in the attorney-client relationship. Rule 9 replaces, at the client's request, any trial in court with a method of dispute resolution that accords full due process to the attorney, including the judicial safeguards of the Uniform Arbitration Act. Furthermore, the entire fee arbitration system operates under the direction of a creature of the court, the Board of Overseers of the Bar. The lawyer appealing in the case at bar makes no argument, and could make no argument, that fee arbitration is likely to produce any less reliable, or any less fair, determination than a jury trial. In these circumstances, the court's action in providing the client a faster and procedurally less forbidding forum for fee disputes, while at the same time assuring the attorney a fair and reasonable determination, comes within the court's constitutional authority to regulate the attorney-client relationship.

*Id.* at 1049.

■ We are in substantial agreement with the language quoted above from the New Jersey and Maine courts.[4, 5] "The crux of due

---

**4.** *But see DeLisio v. Alaska Superior Court,* 740 P.2d 437 (Alaska 1987) (state constitution's "takings clause" prohibits appointment of private attorney to represent indigent criminal defendant without reasonable compensation).

**5.** We have no occasion to question Miller's premise that generally appellate review on the

process is an opportunity to be heard and the right to adequately represent one's interests." *Keyes v. Humana Hospital,* 750 P.2d 343, 353 (Alaska 1988). The fee arbitration rules readily satisfy these minima.[6]

■ Due process is a flexible concept and may require additional protections. In determining the reach of due process in a particular setting we have employed the approach expressed in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Smith v. State, Dep't of Corrections,* 872 P.2d 1218, 1222 (Alaska 1994); *Matter of K.L.J.,* 813 P.2d 276, 279 (Alaska 1991).

Both the attorney and the former client have an interest in fair, expedient and inexpensive adjudication. Appellate review of an arbitration panel's decision in order to determine either clear error of fact or law would reduce the risk of an unjust decision by an arbitration panel. On the other hand the same considerations which underlie the limits on appealability under the arbitration act apply to those limits in the context of attorney fee arbitration. They are that review on the merits tends to cause delay, necessitates greater judicial involvement, is more apt to require the employment of counsel, and thus cause greater expense, and is more apt to

result in the need for additional hearings and in this way too will contribute to added delay and expense.

In addition to these generic considerations there are factors which are unique to attorney fee arbitration. These are the need for public confidence in the lawyer/client relationship, the difficulty which clients of limited income may have in procuring an attorney to represent them against another attorney, and the vulnerability of clients when litigating against their former lawyers. Also to be considered is the fact that Alaska has had mandatory fee arbitration since 1974. The system has apparently worked well. There have been some 400 cases disposed of by fee arbitration panels during the last decade and the process seems to be working as it was designed to work.

■ In view of these factors and circumstances we are not convinced that, for purposes of the *Mathews v. Eldridge* approach, the benefits to be gained from appellate review on the merits necessarily outweigh the detriments which such review would entail. The burden is on the party who challenges a statute or rule on constitutional grounds to demonstrate unconstitutionality, for there is a presumption of constitutionality which attaches to such enactments. *Bonjour v. Bonjour,* 592 P.2d 1233, 1237 (Alaska 1979); *McCracken v. State,* 518 P.2d 85, 89 (Alaska 1974). That burden has not been discharged in this case.

AFFIRMED.

MOORE, C.J., not participating.

RABINOWITZ, Justice, dissenting.

I dissent from the court's holding that Miller has failed to demonstrate that Alaska Bar Rule 40(u) violates due process under Alaska's Constitution. More particularly, I

---

merits from mandatory arbitration proceedings is required. *See K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 357–58 (Alaska 1971) (supreme court will review administrative adjudication "to ascertain whether the applicable rules of law and procedure were observed" and, as to fact determinations, "to find whether the admin-

istrative decision has passed beyond the lowest limit of the permitted zone of reasonableness to become capricious, arbitrary or confiscatory" even though a statute prohibits judicial review).

6. *See supra,* pp. 611–613.

agree with Miller's argument that mandatory fee arbitrations are constitutional only when there is judicial review on the merits—that is, that awards should be reviewable for clearly erroneous findings of fact and arbitrary and capricious applications of the law.

As noted in *State v. Public Safety Employees Ass'n*, 798 P.2d 1281, 1287 (Alaska 1990):

> Compulsory arbitration is different. The parties have not agreed voluntarily to accept reduced possibilities of appellate review in order to resolve their dispute swiftly. It is by operation of law that the parties are denied their usual right to have their disputes resolved by the courts. Therefore, a standard of review higher than gross error is appropriate.

In the case at bar I would hold, as a matter of constitutional law, that the arbitrator's or panel's findings of fact are reviewable under a clearly erroneous standard.

In my opinion none of the reasons advanced by the court for rejecting Miller's constitutional argument are persuasive. The mere fact that a fee arbitration system, which denies due process, has worked well—some 400 cases having been disposed of during the last decade—does not prove that the system is constitutionally sound. The pre-*DeLisio*[1] system of court appointed counsel for indigent criminal defendants worked well for many, many years.

At present parties to mandatory attorney fee arbitrations can seek review of an arbitrator's or fee arbitration panel's award on seven separate grounds:

(1) the award was procured by fraud or other undue means;

(2) there was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of a party;

(3) the arbitrators exceeded their powers;

(4) the arbitrators refused to postpone the hearing upon sufficient cause being shown for postponement or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of AS 09.43.050, as to prejudice substantially the rights of a party;

(5) there was an evident miscalculation of figures or an evident mistake in the description of a person, thing or property referred to in the award;

(6) the arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

(7) the award is imperfect in a matter of form not affecting the merits of the controversy.

AS 09.43.120(a)(1)-(4); AS 09.43.130(a)(1)-(3).

Given the fact that seven discrete grounds are subject to review I am not persuaded that additionally according the parties to mandatory fee arbitration proceedings the right to appellate review of findings of fact will lead to significantly greater delays, expense, or judicial involvement, or will have the effect of eroding the public's confidence in lawyer-client relationships or in the judicial system. In my view fundamental fairness mandates that findings of fact filed by arbitrators or panels in mandatory fee arbitrations should be reviewable on the merits. Alaska Bar Rule 40(q) highlights the importance of the arbitrator's or panel's findings. This rule requires that the decision of the arbitrator or panel will include "the findings of the arbitrator or panel on all issues and questions submitted which are necessary to resolve the dispute." Alaska Bar R. 40(q)(3).[2]

In conclusion I would hold that the attenuated standard of review provided for under Alaska Bar Rule 40(u) violates due process

---

1. *DeLisio v. Alaska Superior Court*, 740 P.2d 437 (Alaska 1987). In *DeLisio* this court rejected a long tradition of compulsory representation of indigent defendants without full compensation.

2. If necessary this court can devise inexpensive and streamlined procedures in order to expedite review of fee arbitration appeals that place in question the arbitrator's or panel's findings of fact.

under Alaska's Constitution.[3]

---

**3.** To the extent necessary I would overrule *Breeze*     *v. Sims*, 778 P.2d 215 (Alaska 1989).